FILED

2022 Feb-03  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**
*ex rel.*, **STARR CULPEPPER and**
**O. TAMEKA WREN,**
    **Plaintiffs/Relators,**

**v.**

**BIRMINGHAM JEFFERSON**
**COUNTY TRANSIT**
**AUTHORITY,** *et al.*,
    **Defendants.**

**Case No. 2:18-cv-00567-CLM**

## MEMORANDUM OPINION

As explained within, the court **DENIES** Relators' motion for partial summary judgment on the issue of materiality (doc. 126) and **GRANTS IN PART and DENIES IN PART** the BJCTA and Murdock's motion for summary judgment (doc. 124) and Strada and Watters' motion for summary judgment (doc. 127). The parties will try these counts to the jury:

- **Count III**:  Implied False Certification Theory against all Defendants, limited to Task Orders 7, 7a, 7b, 12, and 24;
- **Count V**:  Conspiracy to imply false certifications against all Defendants, limited to Task Orders 7, 7a, 7b, 12, and 24; and,
- **Count VI**:  Retaliation against Starr Culpepper.

The court will enter an order that dismisses all other counts with prejudice. The court also **DENIES as MOOT** Relators' motion to strike expert testimony (doc. 105).

## BACKGROUND

At its core, this case is about whether the Birmingham Jefferson County Transit Authority (BJCTA) had to tell the federal government that it was paying federal grant monies to Strada Professional Services, LLC (Strada) for sole-source contract work on the Bus Rapid Transit Project. A former BJCTA employee, Starr Culpepper, and a former board member, O. Tameka Wren, claim that it did. So they sued the BJCTA, Strada, and their executive directors at the time to recover the grant money and penalize the Defendants on behalf of the United States, making them "Relators," a term the court uses to describe the plaintiffs.

That's the simple description. But this is not a simple case. So the court dives deeper into the law and facts below.

## I.    Strada's plan for the Bus Rapid Transit

As its name implies, the BJCTA provides public transportation in the Birmingham–Jefferson County area. The Bus Rapid Transit (BRT) Project is a collaboration between the City of Birmingham and the BJCTA to update Birmingham's inner-city transit system by connecting 25 neighborhoods.

Strada is an engineering and consulting company. Starting in March 2015, Strada worked with the City, the BJCTA, and others to develop a plan for the BRT project. Two months later, Strada recommended that the City create a Program

2

Management Office and Program Management Team to coordinate all BRT Project activities and recommended that the City hire Strada to serve as the Program Manager. The City agreed.

In June 2015, the City—with Strada's help—applied for a $20 million federal grant for the BRT Project. The Federal Transit Authority (FTA) awarded the grant to the City in October 2015. The next month, the City and Strada signed a Close Out agreement for Strada's work to date. Then in May 2016, the City and Strada signed an agreement for Strada's continued consulting services.

## II.    RFQ 15-17 & the Brooks Act

At the same time Strada was helping the City apply for the $20 million grant (June 2015), the BJCTA issued a Request for Qualifications from firms that supply engineering and technical consulting services. They titled it RFQ 15-17.

RFQ 15-17 instructed candidate firms how to apply. The last two instructions said that RFQ 15-17 "shall be interpreted to be consistent with FTA Circular 4220.1F, Third Party Contracting Guidance," and "the Best Practices Procurement Manual published by the FTA." (Doc. 125-2 at 15, Instructions 1.28 & 1.29).

Both FTA Circular 4220.1F and the Best Practices Manual require recipient agencies like the BJCTA to procure architectural and engineering (A&E) services "in accordance with the 'qualifications-based procurement methods' of the Brooks

Act." (Doc. 131-3 at 318). So does the Master Agreement between the FTA and federal grant recipients like the BJCTA. (Doc. 87-35 at 52).

The Brooks Act lays out a two-step procurement process for A&E services. First, the grantee agency discusses "anticipated concepts" and "alternative methods for furnishing services" (but not costs) with potential firms and selects "in order of preference, at least 3 firms that the agency head considers most highly qualified to provide the services required . . . based on criteria established and published by the agency head." 40 U.S.C. § 1103(c)-(d). In step two, the grantee agency then negotiates the contract, including costs, as spelled out in 40 U.S.C. § 1104:

> (a) **In general**.--The agency head shall negotiate a contract for architectural and engineering services at compensation which the agency head determines is fair and reasonable to the Federal Government. In determining fair and reasonable compensation, the agency head shall consider the scope, complexity, professional nature, and estimated value of the services to be rendered.

> (b) **Order of negotiation**.--The agency head shall attempt to negotiate a contract, as provided in subsection (a), with the most highly qualified firm selected under section 1103 of this title. If the agency head is unable to negotiate a satisfactory contract with the firm, the agency head shall formally terminate negotiations and then undertake negotiations with the next most qualified of the selected firms, continuing the process until an agreement is reached. If the agency head is unable to negotiate a satisfactory contract with any of the selected firms, the agency head shall select additional firms in order of their competence and qualification and continue negotiations in accordance with this section until an agreement is reached.

### III.    The BJCTA's selection process

How one reads the "order of negotiation" part of § 1104 matters because the BJCTA's evaluators ranked Strada #3 among the five responses to RFQ 15-17:

| Rank | Firm | Score |
|------|------|-------|
| #1 | Whitman, Requart & Assoc. (WRA) | 386 |
| #2 | Wendel Architecture, P.C. (Wendel) | 349 |
| #3 | Strada Professional Services LLC | 334 |

The BJCTA's director of grants and procurements, Brenda Perryman, asked the BJCTA Board of Directors for permission to sign contracts with all three firms, not just #1-ranked WRA. The Board passed Perryman's proposed resolution on October 28, 2015. (Doc. 125-3 at 8). In it, the Board authorized Perryman to sign a contract with each firm "to perform task order engineering and architectural (A&E) services as needed for 1-year with (4) optional 1-year extensions; and not to exceed $30,000 per year." (*Id.*) Strada executed the first contract on October 1, 2015—27 days before the Board passed the resolution permitting Perryman to sign all three firms. WRA and Wendel executed their contracts in early 2016.

**IV.    The task orders**

The three contracts called for the BJCTA to assign specific tasks by "task orders" with price being determined by the task orders. The parties agree that from November 2015 through the Fall of 2017, Strada and the BJCTA agreed to "at least thirty (30) task orders." (*Id.*). The parties also agree that the BJCTA paid Strada for three of these task orders with federal grant monies: Task Orders 7, 12, and 24.[1]

The agreement stops there. Relators say that the BJCTA did not negotiate or assign any task orders under RFQ 15-17 to WRA or Wendel until 2019—long after the BJCTA awarded Strada Task Orders 7, 12, and 24 (2016–17) and Relators filed this lawsuit (2018). (Doc. 137 at 6, ¶¶ 19–20).

The BJCTA admits that "Strada received the bulk of the task orders issued under RFQ 15-17" (doc. 135 at 15) but disputes Relators' statement that WRA and Wendel received no task orders from November 2015 through the Fall of 2017 by pointing to this statement from the declaration of former BJCTA Executive Director Frank Martin: "Wendel and WRA also received work from the BJCTA as qualified A&E vendors under RFQ 15-17." (Doc. 152 at 6, citing 125-1 at 7, ¶ 19).

But the BJCTA does not say when it first gave a task order to WRA or Wendel, and Martin, as BJCTA's Rule 30(b)(6) corporate representative, testified that he was

---

[1] Task Order 7 had two parts that were paid with federal grant money: 7a and 7b.

unaware of any work that WRA performed under RFQ 15-17 and that he could not "recall off the top of [his] head" if Wendel received a contract to do work under RFQ 15-17. (Doc. 125-7 at 67).

Nor does the BJCTA point to any evidence that it negotiated Task Orders 7, 12, or 24 with WRA, Wendel, or any firm other than Strada. To the contrary, Defendant Murdock, who was BJCTA's executive director at the time, testified that Strada drafted Task Orders No. 7, 12, and 24. (Doc. 125-10 at 110–11, 135–57, 181–84). Strada ended each task order with the sentence, "I authorize Strada Professional Services LLC to provide the Scope of Work described herein." (Docs. 87-10, 87-11, 87-12, 87-20, 87-23). Murdock testified that she could not recall negotiating the price for these draft orders before the BJCTA accepted them and she signed them. And during Murdock's deposition, the BJCTA's counsel stipulated that "beyond RFQ 15-17, there were no additional public solicitations for Task Orders 1 through 30. . . . And there were no – there was never any RFPs issued." (Doc. 125-10 at 17, p. 57:4-20).

Based on the evidence submitted, counsel's stipulation, and the BJCTA's argument about how the Brooks Act works (doc. 135 at 50–52), the court finds for Rule 56 purposes only that the BJCTA did not negotiate Task Orders 7, 12, or 24 with any firm but Strada.

## V.     The False Claims Act

So far, the court has laid out the facts that Relators say prove that the BJCTA violated the Brooks Act. But that gets us only half way because Relators did not file their claims under the Brooks Act; they sued the Defendants for violating the False Claims Act. So the court now discusses how the BJCTA's certification and reporting requirements interact with the alleged Brooks Act violations. And thanks to the FTA using different online systems for certifying compliance and seeking payment of funds—*i.e.*, the ECHO and TrAMS systems—that discussion requires two parts.

1. ECHO / reimbursement: Three sources provided the federal funds that the BJCTA used to pay Strada for Task Orders 7, 12, and 24: a grant that the FTA awarded the BJCTA in February 2015 (95-X007) and two repurposed grants that the FTA originally awarded the BJCTA in 2003 (03-0058) and 2008 (03-0077). The BJCTA modified the budget descriptions for the repurposed grants to specifically describe Task Orders 7 and 12. (Doc. 121-5 at 49–50, 79–81).

The Master Agreement between the FTA and the BJCTA required the BJCTA to use the "Electronic Clearinghouse Operation Web System (ECHO-Web)" to request the funds to pay Strada. (Doc. 87-35 at 28). The process was simple. The BJTCA's grant director—then Stephanie Walker—logged in to ECHO and filled out these fields:

(Doc. 125-16 at 5).[2] Once Walker completed the fields, the ECHO system informed her that her "payment request [had] been successfully submitted" and gave her a confirmation number. (*Id.* at 7). Walker then printed a confirmation that showed her as the "Requestor" and Executive Director Murdock as the "Approving Official." (*Id.* at 8-9, 12). The ECHO system did not require Walker to certify compliance with federal statutes or FTA rules or regulations, nor did it require her to describe or make any other representations about the goods and services that Strada provided.

2. TrAMS / certification: The BJCTA certified compliance with the Brooks Act through the Transit Asset Management System ("TrAMS"). The FTA created TrAMS to allow grant recipients to manage their applications and awards, and the

---

[2]The fields that require input are PO Number, Scope, Suffix, Request Amount, and Return Amount. The ECHO system automatically populates the ECN, Date, Vendor Name, Sequence #, and PO Balance fields. (Doc. 125-16 at 6–7).

Master Agreement required the BJCTA to use TrAMS "to submit its application for an Award, reports, documents, or other information required by federal law, regulations, or requirements." (Doc. 87-35 at 28, 74).

The Master Agreement says that "when procuring architectural engineering or related services with federal assistance appropriated . . . the Recipient agrees to comply and assures that each of its Subrecipients will comply with 49 U.S.C. § 5325(b)[,]" which in turn requires compliance with the Brooks Act. (Doc. 87-35 at 52); *see also* 49 U.S.C. § 5323(n) ("[T]he Secretary shall publish annually a list of all certifications required under this chapter."). So, each year, one BJCTA employee and one BJCTA attorney electronically submitted the requisite "Certifications & Assurances" form through the TrAMS system, which included a certification that the BJCTA conducted its procurements in accordance with federal law and regulations, including the Brooks Act and FTA Circular 4220.1. (Doc. 125-1 at 118–29).

## VI.   Lawsuit and FTA Inquiry

1. Relator Culpepper worked for the BJCTA from 2013 until she was fired in April 2018. Culpepper says that she repeatedly complained to BJCTA employees and executives that the BJCTA was violating the Brooks Act by awarding sole-source contracts to Strada and that the BJCTA fired her because of her complaints.

The BJCTA says it fired Culpepper for misuse of a company credit card.

Relator Wren was the chairperson of the BJCTA Board of Directors from October 2017 until January 2018. Relators Culpepper and Wren filed this lawsuit under seal with the U.S. Attorney on April 9, 2018.

2. Soon after, the FTA started looking into Strada's relationship with the City and the BJCTA. In May 2018, the City told Strada about the inquiry and asked Strada to stop all work for the City on the BRT Project. In December 2018, the FTA told the City that it needed to pay back more than $260,000 in federal funds "due to the fact that no documentation of a competitive procurement for professional services was provided by the City of Birmingham," even though "the City of Birmingham has a procurement and contract administration which provides instruction on conducting third-party procurements in accordance with the guidance of the FTA Circular 4220.1F." (Doc. 125-7 at 269–70). The City returned the grant money to the government.

The same is not true for the BJCTA. In November 2018, the FTA asked the BJCTA for confirmation that it had awarded Strada the task orders "in a manner that complies with FTA Circular 4220 (*i.e.* that the contractor was selected through a fair and open competitive process)." (Doc. 125-26 at 7). The BJCTA responded by sending multiple documents, including RFQ 15-17, the evaluators' affidavits, and

the BJCTA Board resolution that allowed the BJCTA to sign a contract with the top three firms. FTA employees reviewed these and other BJCTA documents over the next few months. Ultimately, the FTA did not impose any penalties or restrictions on the BJCTA, nor did the FTA require the BJCTA to pay back any money.

## STANDARD OF REVIEW

In considering cross-motions for summary judgment, the court views the facts "in the light most favorable to the non-moving party on each motion." *See Chavez v. Mercantile Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

### I.   Relators' Motion to Strike (doc. 105)

Before the court jumps into the merits, Relators move to strike or limit the testimony of BJCTA's expert witness, Jack Collins, because they say he: (1) recites legal standards and conclusions, (2) fails to show a specialized methodology that could help a trier of fact, and (3) lacks the credentials and training necessary to give expert testimony about A&E procurements. (Doc. 105). The court needn't rule on the motion now, however, because—regardless of the court's decision about Collins' testimony—the court would reach the same decision on the parties' motions for summary judgment. So the court will deny as moot the motion to strike. The Relators can raise their issues with Collins' report and testimony again in pretrial motions.

### II.   Motions for Summary Judgment (docs. 124, 126, 127)

The court now turns to the cross motions for summary judgment. Because three issues permeate Counts I–V, the court starts by tackling them to simplify review of the individual counts.

#### A. The Overarching Issues

Counts I–V allege various violations of the False Claims Act. To prevail on an FCA claim, Relators must generally prove that the Defendants (1) made a false statement, (2) with scienter, (3) that was material, and (4) caused the government to

pay out money or forfeit money due. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015). Defendants make arguments on each element that cut across Counts I–V. The court deals with them here.

### 1. Payment or Forfeiture of Federal Monies

Relators seek FCA-based penalties for all of the task orders performed by Strada, not just the task orders that were paid with federal money. (Doc. 155 at 55). But the "'*sine qua non* of a False Claims Act violation' is the submission of a false claim to the government." *Urquilla-Diaz*, 780 F.3d at 1045. Indeed, each of the four provisions that Relators say the Defendants violated requires federal money in some way. Counts I and III rely on 31 U.S.C. § 3729(a)(1)(A), which penalizes presenting "a false or fraudulent claim," a term later defined to present a "request or demand . . . for money or property" from the federal government or a third-party who will pay with federal funds. 31 U.S.C. § 3729(b)(2)(A). Counts II and III rely on § 3729(a)(1)(B), which penalizes making "a false record or statement material to a false or fraudulent claim." Count IV relies on 31 U.S.C. § 3729(a)(1)(G), which penalizes the failure to pay money owed to the federal government. And Count V relies on § 3729(a)(1)(C), which penalizes conspiring to commit one of the previously mentioned sections.

14

Of the 30 task orders that Strada performed, Relators only present evidence that Task Order Numbers 7, 7a, 7b, 12, and 24 were paid with federal money. So only claims related to those task orders can be penalized under 31 U.S.C. § 3729(a). The court will thus dismiss all counts to the extent that they seek to penalize Strada's procurement of Task Order Numbers 1–6, 8–11, 13–23, and 25–30.

### 2. Falsity & Scienter: The Brooks Act

Counts I–V hinge on the Defendants' alleged violation of the Brooks Act. If the Defendants complied with the Brooks Act and FTA Circular 4220.1, which requires compliance with the Brooks Act, then Relators cannot prove false statements or scienter, which is knowledge or reckless disregard of a false statement.

### A. *Falsity: Did the Defendants comply with the Brooks Act?*

The Defendants argue that they complied with the Brooks Act because, once the evaluation committee selected WRA, Wendel, and Strada as the "most highly qualified" A&E firms under 40 U.S.C. § 1103, Murdock had "broad discretion" to decide whether WRA, Wendel, or Strada was the "most highly qualified firm" for each new task order under 40 U.S.C. § 1104. (Doc. 135 at 46–51). So the court should grant summary judgment, they say, because "it is undisputed that Murdock selected Strada for Task Order Nos. 7, 7a, 7b, 12, and 24 because she believed Strada to be the 'most highly qualified' A/E firm for those particular task orders." (*Id.*

quoting Doc. 125-13 at 5, ¶13). The court disagrees for factual, textual, and policy reasons. The court takes them in that order.

1. <u>Factual</u>: The Defendants' proposed fact 42 says, "[I]t is undisputed that Murdock selected Strada for Task Orders 7, 7a, 7b, 12, and 24 because she believed Strada to be the 'most highly qualified' A/E firm for those particular task orders." But Relators ***do*** dispute this fact:

> 42. Denied. Relators deny BJCTA's assertion that Murdock 'deemed' Strada the most highly qualified firm for task orders 7, 12, and 24. It is undisputed that no requests for proposals were done to make such a determination. (*See* Frank Martin's Deposition, Doc. 125-7; ECF 59; pp. 222: 2–12; 224: 8–23; 225:1–6).

(Doc. 155 at 12, ¶ 42). They do so with reason. The BJCTA supports proposed fact 42 with a declaration that Murdock signed on the day that evidentiary submissions were due, not her testimony.[3] (Doc. 125-13 at 4). And to say that Murdock personally "selected" Strada for the task orders "because she believed Strada to be the most highly qualified" firm contradicts much of her testimony.

For example, saying that Murdock selected Strada based on her judgment of Strada's qualifications contradicts her deposition testimony that Strada wrote the task orders, the Board approved them, and she signed them without negotiation. (Doc. 125-10 at 110–11; 135–57, 181–84). It also flouts her testimony that the

---

[3] The declaration still contains what looks like a law firm's document and version number in the bottom corner.

BJCTA would meet with Strada to discuss the scope of the next project, ask Strada to draft a task order that carried it out, get back together to edit Strada's draft, then allow Strada to draft the final task order that authorized Strada to perform the task.[4] (Doc. 125-10 at 10, pp. 29: 8–14, 31: 1–7).

Next, saying that Murdock selected Strada over WRA because she determined Strada was "the most highly qualified" firm ignores Murdock's testimony that the BJCTA Board would not contract with WRA because WRA had fallen out of the City's graces—not because of their qualification. For example, here's how Murdock responded when Relators asked her why she "spoke directly with Edmond Watters, the CEO of Strada and didn't speak to Mr. Ritchey who was a principal at WR&A":

> A. Well I can speculate, but I know that's not what you want. But WRA, if you recall, I testified, that because their plan had not been sanctioned by the City of Birmingham, we were not directed to work with them. The board of directors made the decision to award the contract for these specific task orders to Strada. So I'm sure that if I was speaking with him, it was in reference to the award.

(Doc. 125-10 at 15, p. 51:18–52:3) (emphasis added). When Murdock said, "if you recall," she was referring to her earlier testimony that explained the falling out between the City and WRA:

> Q. My first question about these three agreements is this: If all of these companies were selected to have on-call contracts in October of 2015, why is it that Strada's contract was entered into with the

---

[4] Each of the task orders ends with the sentence, "I authorize Strada Professional Services LLC to provide the Scope of Work described herein." (Docs. 87-10, 87-11, 87-12, 87-20, 87-23).

BCJTA in October of 2015, but the other two contracts were not entered into until later in 2016? . . .

A. I can only speculate. I cannot remember the specifics. But, again, I'm following FTA guidelines. Well, as I spoke to you earlier about the collaboration with the FTA and the City of Birmingham on supporting the – these – their money supporting these efforts, by this time, WRA had fallen out of grace with the City of Birmingham, because to get the TIGER grant, you had to put together a proposal to, as I said, affect low income neighborhoods. WRA prior to the – when I was chief of staff, and when they were being supported by the MPO, they put together a proposal for – for the BRT that took the route over the mountain. So the City of Birmingham was no longer – their – their proposal, and what was required for the TIGER grant for the BRT were now no longer in sync. I think at that time – I don't remember the exact timeline -- the City hired STRADA to put together this plan, so by the time all of this, I'm sure, got to the Board of Directors, that was why WRA was not probably moved -- given most of the work, because the plans that had been approved were the plans approved by the City of Birmingham that – I don't know when it could have happened – but were in conjunction with their directive – their directions for STRADA and the city – city revitalization plan. That's what I speculate. I cannot say that that's exactly what happened. I do remember that there was a gap in time, because there was lots of discussion in the board room regarding WRA and their qualifications now. So again, all of that would be [bared] -- should be [bared] out if you look at the board minute records.

(Doc. 125-9 at 24, p. 86:23–88:22). Murdock then refuted any suggestion that she could have selected WRA to perform a Task Order despite the fall out over the TIGER grant:

Q. All right. So put that to the side. You could – BJCTA still could have entered into agreements with the WR&A on projects that were not tied to the TIGER grant, correct?

A. That would have been a decision the Board would have made.

Q. Okay. No, it says – your agreement said that you can negotiate the contracts. So you were involved in that process as well.

A. I would never make a decision that was counter to the Board's — are you saying that I could have just gone on and said, Okay, let's give money to WRA?

Q. I'm saying – first, I'm striking that as nonresponsive. Second, I'm asking you – we just went over your agreement where it says you negotiate the contracts and you provide oversight on those contracts. The Board approves the contracts, but you negotiate them. So back to you as the director –

A. No, sir, no, sir, no, sir, that's – that's not true.

(Doc. 125-9 at 32, pp. 118:21 – 119:21).

Plus, saying or insinuating that Murdock "selected" Strada against other firms that the BJCTA considered for Task Orders 7, 12, or 24 contradicts the BJCTA counsel's stipulation that "beyond RFQ 15-17, there were no additional public solicitations for Task Orders 1 through 30. . . . And there was never any RFPs issued." (Doc. 125-10 at 17, p. 57:4-20). Counsel made that stipulation to stop Relators' counsel from continuing to ask Murdock the question: "Was there any public announcement or public solicitation that went out to A&E vendors prior to the BJCTA awarding Task No. __"? (*Id.* at 16-17, pp. 56:20 – 57:1). This stipulation matches the BJCTA corporate representative's testimony that the BJCTA never solicited work on RFQ 15-17 from any firm except Strada. (Doc. 125-7 at 58–59,

pp. 223:22–225:6).

To sum up, the court could strike the declaration and corresponding statement of fact (¶42) because they "contradict[] previous deposition testimony and the party submitting the [declaration] does not give any valid explanation for the contradiction." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010). But the court needn't go that far because, at best for the Defendants, the declaration creates a fact question whether Murdock contracted with Strada because she found Strada the "most highly qualified firm" under 40 U.S.C. §1104(b). That reason alone is sufficient to deny summary judgment on the falsity issue. It's not the only one.

2. <u>Text</u>: Let's assume that Murdock awarded Strada the task orders because she determined that Strada was the "most highly qualified" firm to perform each task. The Defendants still face the legal question whether Murdock could make that decision without first negotiating with WRA or Wendel—*i.e.,* the two firms that the evaluation committee found to be the most and second most qualified A&E firms.

To answer that question, the court must "consider the entire text [of the Brooks Act], in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012); *see also McNeil v. United States*, 563 U.S. 816, 819 (2011) ("As in all statutory construction cases, we begin with the language itself and the

specific context in which that language is used."). So the court quotes both §§ 1103

and 1104 in full, highlighting the phrases that mention "qualified" firms:

### 40 U.S.C. § 1103. Selection procedure

(a) In General.--These procedures apply to the procurement of architectural and engineering services by an agency head.

(b) Annual Statements.--The agency head shall encourage firms to submit annually a statement of qualifications and performance data.

(c) Evaluation.--For each proposed project, the agency head shall evaluate current statements of qualifications and performance data on file with the agency, together with statements submitted by other firms regarding the proposed project. The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services.

(d) Selection.--From the firms with which discussions have been conducted, ==the agency head shall select, in order of preference, at least 3 firms that the agency head considers most highly qualified to provide the services required.== Selection shall be based on criteria established and published by the agency head.

### 40 U.S.C. § 1104. Negotiation of Contract

(a) In general.--The agency head shall negotiate a contract for architectural and engineering services at compensation which the agency head determines is fair and reasonable to the Federal Government. In determining fair and reasonable compensation, the agency head shall consider the scope, complexity, professional nature, and estimated value of the services to be rendered.

(b) Order of negotiation.--==The agency head shall attempt to negotiate a contract, as provided in subsection (a), with the most highly qualified firm selected under section 1103 of this title. If the agency head is unable to negotiate a satisfactory contract with the firm, the agency==

==head shall formally terminate negotiations and then undertake negotiations with the next most qualified of the selected firms==, continuing the process until an agreement is reached. If the agency head is unable to negotiate a satisfactory contract with any of the selected firms, the agency head shall select additional firms in order of their competence and qualification and continue negotiations in accordance with this section until an agreement is reached.

As you can see, the phrase "most highly qualified" modifies the word "firm" in both § 1103 and § 1104, and the plain language of § 1104(b) ties the terms together:

| Step 1 (Selection) § 1103(d) | The agency head shall select, in order of preference, at least 3 firms that the agency head considers most highly qualified. |
|---|---|
| Step 2 (Negotiation) § 1104(b) | The agency head shall attempt to negotiate a contract . . . with the most highly qualified firm ***selected under section 1103 of this title.*** |

By adding the qualifying phrase "selected under section 1103 of this title" to the singular term "the most highly qualified firm," Congress bound the negotiation order in § 1104(b) to the "order of preference" results of the selection and ranking process in § 1103(d). Congress made this connection even more apparent by requiring the agency head to negotiate "with the next most qualified of the selected firms" if talks broke down with "the most qualified firm selected under 1103." In short, Congress required agency heads to negotiate with #1, then #2, then #3, and so on. It did not allow them to choose any firm from the bench.

To demonstrate, this chart applies the statutory language to the selection process in this case:

| THE (AT LEAST THREE) FIRMS SELECTED AS MOST HIGHLY QUALIFIED TO PERFORM THE SERVICES REQUIRED, IN ORDER OF PREFERENCE | |
| --- | --- |
| The most highly qualified firm selected under section 1103 | WRA |
| The next most qualified of the selected firms | Wendel |
| The next most qualified of the selected firms | Strada |

Because the evaluation committee decided that WRA was the most highly qualified firm to perform services under RFQ 15-17 at the end of the § 1103 process, a plain reading of § 1104(d) required Murdock to negotiate with WRA and Wendel before signing Strada.

The court isn't the only one who reads the Brooks Act this way. The FTA teaches this method in the "Qualifications-Based Procurements for Architectural and Engineering Services" section of its Best Practices Manual:

The following procedures apply to qualifications-based procurements:

• Qualifications – Unlike other procurement methods where price is an evaluation factor, an offeror's qualifications are evaluated to determine contract award.

• Price – Price is excluded as an evaluation factor.

> • Most Qualified – Negotiations are first conducted with only the most qualified offeror.
>
> • Next Most Qualified – Only after failing to agree on a fair and reasonable price may negotiations be conducted with the next most qualified offeror. Then, if necessary, negotiations with successive offerors in descending order may be conducted until contract award can be made to the offeror whose price the recipient believes is fair and reasonable.

Federal Transit Authority, *Best Practices Procurement & Lessons Learned Manual*, October 2016, § 3.4.9 at p.60, available online at https://www.transit.dot.gov/sites/ fta.dot.gov/files/docs/funding/procurement/8286/fta-best-practices-procurement-and-lessons-learned-manual-2016.pdf (last accessed on February 2, 2022) (emphasis added). And the BJCTA copied the FTA's language into its Procurements Policies and Procedures Manual. *Compare id.* with (Doc. 128-10 at 77–78).

The BJCTA Defendants offer this argument against the plain reading:

> It is specious to suggest that BJCTA was beholden to negotiate every task order with WRA merely because the evaluators scored WRA's proposal the highest prior to any contracts being awarded. For one thing, the actual task orders and scopes of work did not even exist at the time the evaluators were reviewing the proposers qualifications. How, then, could they have determined that one firm or another was most highly qualified for any particular task order or scope of work?

(Doc. 135 at 51). Even if the Defendants are right that the Brooks Act requirements reset for each new task order or scope of work (and that's a big 'if'), the Defendants fare no better because the Brooks Act would have required the BCTJA Defendants to discuss newly proposed projects with at least three firms before it made an award:

**40 U.S.C. § 1103. Selection procedure**

(a)  In  General.--These  procedures  apply  to  the  procurement  of architectural and engineering services by an agency head.

(b)  Annual  Statements.--The  agency  head  shall  encourage  firms  to submit annually a statement of qualifications and performance data.

(c)  Evaluation.--For each proposed project, the agency head shall evaluate current statements of qualifications and performance data on file with the agency, together with statements submitted by other firms regarding  the  proposed  project.  The  agency  head  shall  conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services.

(d)  Selection.--From  the  firms  with  which  discussions  have  been conducted, the agency head shall select, in order of preference, at least 3 firms that the agency head considers most highly qualified to provide the services required. Selection shall be based on criteria established and published by the agency head.

(emphasis added). While Murdock might have decided that Strada was "the most

highly qualified firm" for every project, someone had to first discuss the project

"with at least 3 firms." The Defendants offer no evidence that Murdock discussed

Task Orders 7, 7a, 7b, 12, or 24 with any firm but Strada before awarding the orders.

So even under a project-by-project reading of the Brooks Act, a reasonable juror

could find that the BJCTA Defendants falsely certified compliance with the Act.

3. Policy: Congress' purpose for the Brooks Act—to ensure competent

professional A&E services at "fair and reasonable prices"—also supports the court's

reading. 40 U.S.C. § 1101; *see also United States v. Bryant*, 996 F.3d 1243, 1256

(11th Cir. 2020) ("As between two competing interpretations, we must favor the 'textually permissible interpretation that furthers rather than obstructs' the statute's purposes.") (quoting Scalia & Garner, *Reading Law* § 4, at 63).

Admittedly, the court's reading of the Brooks Act is less efficient than the Defendants' reading. But the Defendants' reading could render the Act a sham. Imagine if 10 firms respond to the BJCTA's next A&E-related RFQ, and the evaluation committee ranks Strada #8 out of 10 with a score of 26 out of 100. Under the court's reading, Strada could not be awarded any work unless the BJCTA failed to agree on a reasonable price with seven firms that an independent committee considered more qualified. But if the court adopts the BJCTA's reading, the Board only needs to pass a resolution to allow contracts with the eight highest ranked firms—because eight is "at least three" as required by 40 U.S.C. § 1103(d)—to bypass seven higher scoring firms and award every project to Strada, under Strada's terms, at Strada's chosen price.

This scheme could work with any number of firms, in any order of ranking, as long as the agency (a) issues an RFQ before defining the projects, (b) gets three or more responses, and (c) resolves to sign all responding firms. Agencies could rubber stamp proposals written by their chosen firm, without the hassle of negotiating price—just as the City apparently did when the FTA penalized it.

26

Congress said that "[r]ecipients of assistance under this chapter shall conduct all procurement transactions in a manner that provides full and open competition as determined by the Secretary." 49 U.S.C. § 5325(a). Because the Defendants' reading of the Brooks Act could be used to stifle full and open competition, the court rejects it for a plain reading that better promotes full and open competition.

\* \* \*

To sum up, the submitted evidence could allow a reasonable juror to find that the BJCTA Defendants violated the Brooks Act. So the court will deny the Defendants' motions for summary judgment on Counts I–V to the extent that they argue Relators cannot prove the falsity element. The court now turns to scienter.

### B. Scienter: Did the Defendants know they were noncompliant?

The Defendants argue that, even if the court rejects their reading of the Brooks Act, Relators cannot prove scienter because the BJCTA Defendants didn't know they were violating the Brooks Act; they were simply mistaken. (Doc. 135 at 54–55). But Relators have offered evidence that could allow a reasonable juror to find that the Defendants knew they were violating the Brooks Act.

First, Culpepper testified that, from October 2015 through February 2018, she complained to Murdock (executive director), Perryman (procurement director), Adrian Solomon (chief of staff), and others that the BJCTA was violating the Brooks

Act each time it signed Strada's task orders. While Murdock testified that she did not remember Culpepper making these complaints, Solomon testified that that she remembered "Ms. Culpepper coming into Ms. Murdock's office, and the first thing she said was, you know, Strada shouldn't have gotten the contract solo." (Doc. 125-17 at 25, p. 91:17-21).

Second, the BJCTA's own Procurement and Procedures Manual explains that the BJCTA must follow the Brooks Act qualifications-based procedure. Again, the BJCTA's manual—like the FTA's—instructs that "[n]egotiations are first conducted with only the most qualified offeror." (Doc. 128-10 at 78).

Third, Relators point to a December 2015 email exchange in which WRA's vice president Jim Ritchey told Murdock that he believed a recent BJCTA task order proposal violated procurement standards, and he offered to help Murdock "follow the proper process." (Doc. 131-19 at 80–86). Ritchey copied other BJCTA employees, including Perryman (the BJCTA Procurement Director).

The court has reviewed this and other evidence in the parties' submissions and finds that there is enough evidence for a reasonable juror who views the evidence in a light most favorable to Relators to find that the Defendants acted with scienter. So the court denies summary judgment on Counts I–V to the extent that the Defendants argue that Relators cannot prove scienter.

### 3.  Materiality

Finally, both parties seek summary judgment on materiality—meaning that both sides believe their evidence is so strong that no reasonable juror could rule against them. The Supreme Court has said, "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016). And the FCA defines material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

Having a tendency or capability may sound like a low bar. But the Supreme Court has said that the "materiality standard is demanding"; it is not met simply because "the Government would be entitled to refuse payment were it aware of [a statutory, regulatory, or contractual] violation." *Escobar*, 579 U.S. at 194–95. Nor is materiality proved if the noncompliance is minor or insubstantial. *See id.* at 194.

With the standards set, the court briefly recounts some of the evidence each side points to, starting with Relators.

1.  <u>Relators</u>: Relators point out that the Master Agreement between the FTA and the BJCTA conditions the receipt and retention of grant funds on compliance

with procurement rules. (Doc. 87-35 at 52). And they argue that the BJCTA

conceded materiality when its corporate representative testified like this:

> Q: My question is – my question is, you understand then just like this
> investigation report go, just like they did with the City of
> Birmingham, you understand that it is a material issue for the
> federal government via the FTA that its procurement procures be
> followed. Because if they're not followed, they will come back in
> and demand their money.

> A. Sure, Yes. Absolutely.

(Doc. 125-1 at 86, p. 335:5–13). And this:

> Q. Are you aware, sir, that as a transit authority engages in the
> procurement of services that violate federal rules concerning that
> procurement, that that transit authority would have to pay back the
> monies that were paid out to the contractor and the third-party
> contractor? They would have to pay that money back to the FTA?

> A. If they violated the law?

> Q. If they violated FTA's procurement rules, are you aware that a transit
> authority would have to pay back federal funds that were used in the
> violation back to the FTA?

> A. If the -- if the authority had violated rules as sanctioned by the FTA,
> then, yes, it is common practice that they would have to pay that
> money back.

(*Id.* at 67, p. 260:3–21).

The BJCTA Defendants respond that the Rule 30(b)(6) admission was

general, not based on the facts here. In other words, the BJCTA acknowledges that

the FTA *may* take back an agency's funds for violating the Brooks Act, but that

doesn't mean (a) it violated the Brooks Act here or (b) even if it did, the FTA would find its violation to be severe enough to warrant a return of funds. As the Supreme Court said, "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194.

Relators say, however, that we know the FTA cares about sole-source contracts because it forced the City to pay back the monies it used to pay Strada.

2. <u>The BJCTA Defendants</u>: Of course, the BJCTA Defendants flip the City saga back on Relators by arguing that the FTA's decision to punish the City but not the BJCTA—even though the FTA looked into both entity's dealings with Strada—disproves materiality. If the FTA did not require the BJCTA to pay the money back, the argument goes, there is no reason to believe that the FTA would have refused to give the BJCTA the money when it applied. *See generally Escobar*, 579 U.S. at 195 (calling the government's payment of funds despite knowledge of a technical violation "strong evidence" that the violation was not material).

Relators say this is a red herring because the FTA did not conduct a full investigation or reach a final conclusion. Relators claim that the FTA's Triennial

Review did not involve Strada's work on RFQ 15-17 and that the FTA advised that the review was "not intended as, nor does it constitute, a comprehensive and final review of compliance with award requirement." (Doc. 166 at 20). Relators also claim that the FTA employee emails reveal that they did not know of all the facts.

3. The court could continue the back-and-forth, but it's unnecessary. The court has considered both sides' evidence and finds that both have strengths and weaknesses. A reasonable juror that views the evidence in a light most favorable to Relators could find materiality. And a reasonable juror that views the evidence in a light most favorable to the Defendants could find that materiality is lacking. So the court will deny Relators' motion for summary judgment on materiality and will deny the Defendants' motions for summary judgment on Counts I–V to the extent that they argue that Relators could not prove materiality.

\* \* \*

To sum up, the court does not find that either party is entitled to summary judgment on any of the elements common to Counts I–V. So the court now decides whether any of the counts must be dismissed for reasons that apply only to that count.

**B. Individual Claims**

Relators plead three counts (Counts I–III) under the first two FCA subsections. This chart briefly lists the different theories as Relators explain them:

| Count I | § 3729(a)(1)(A) | BJCTA and Murdock directly presented false claims for payment to the FTA.<br><br>(Doc. 155 at 23) |
|---------|----------------|------------------------------------------------------------|
| Count II | § 3729(a)(1)(B) | BJCTA, Murdock, Strada, and Watters made false records or statements material to a false or fraudulent claim for payment to the FTA.<br><br>(Doc. 155 at 23) |
| Count III | § 3729(a)(1)(A)<br>§ 3729(a)(1)(B) | BJCTA and Murdock falsely implied compliance with the Brooks Act and FTA Circular when presenting a claim for payment to the FTA.<br><br>Strada and Watters made records or statements that falsely implied compliance with federal rules and regulations that were material to a false claim for payment to the FTA.<br><br>(Doc. 155 at 24-25) |

- **Counts I–II (false claim & false statement)**

Both Counts I and II require proof of a "false or fraudulent claim" for payment to the FTA. 31 U.S.C. § 3729(a)(1)(A), (B). The Defendants argue that Relators cannot prove that the BJCTA or Murdock submitted a false claim for payment because all the information that Stephanie Walker entered into the ECHO payment

system was factually correct; Strada performed and invoiced all of the work that was reimbursed; and the BJCTA gave the grant monies to Strada. In other words, there was nothing "false or fraudulent" in the BJCTA's payment request or the invoices that supported the request.

Relators counter that Counts I and II should survive because "each time Defendants Strada and Watters created an invoice containing costs associated with a task order agreement, they include[d] costs that Strada was not eligible to receive . . . because Strada's services were not obtained in compliance with the Brooks Act" and other federal rules and regulations. Doc. 155 at 43. But this argument misses the point—or more correctly, points to the wrong counts. Counts I and II require proof that the BJCTA's claim for payment was false, not that the BJCTA disregarded rules and regulations. That's Count III. Because Relators offer no evidence that the BJCTA's claim for payment was factually false or fraudulent, the court will grant summary judgment for all Defendants on Counts I–II.

- **Count III (implied false certification)**

Relators needn't prove a false statement within the BJCTA's payment requests in Count III. Instead, Relators allege that BJCTA and Murdock falsely implied compliance with the Brooks Act and related requirements each time they sought reimbursement for Strada's work (a violation of § 3729(a)(1)(A)) and that

Strada and Murdock made false records or statements—*i.e.*, invoices, task orders, and the on-call contract—that were material to the BJCTA and Murdock's false certification (a violation of § 3729(a)(1)(B)). The Supreme Court recognized this false certification theory in *Escobar*, allowing the Government or Relators to sue grant recipients for misrepresenting "compliance with a statutory, regulatory, or contractual requirements" that are "material to the Government's payment decision." 579 U.S. at 192.

The Supreme Court added two requirements to prove an implied false certification claim: (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 579 U.S. at 190. The court has already found that a jury question exists on the issue of materiality under *Escobar*, plus the general elements of falsity and scienter, so the court needs only to determine whether Relators presented enough evidence that would allow a reasonable juror that the BJCTA's payment claims made "specific representations about the goods or services provided." *Id.*

1. The BJCTA Defendants: The Defendants argue that no reasonable juror could find that the BJCTA or Murdock made "specific representations about the

goods and services provided" because "[a]ll that BJCTA submitted were mere claims for payments. BJCTA simply did not make any 'specific representations' regarding the 'services provided' by Strada in connection with its reimbursement requests." (Doc. 135 at 36–37.) The Defendants might be right, if the court viewed their payment requests with blinders.

The Defendants are right that Stephanie Walker typed limited data into the ECHO system when seeking reimbursement for Strada's work on Task Orders 7, 12, and 24—*i.e.,* a PO Number, Scope, Suffix, Request Amount, and Return Amount. The ECHO system automatically populated the remaining fields: ECN, Date, Vendor Name, Sequence #, and PO Balance fields. (Doc. 125-16 at 6-7). But the Defendants cannot pretend that, when Walker hit the "submit" button, this was the only information that the FTA had about Strada's goods and services.

The BJCTA worked with the FTA for months to repurpose grant monies to pay for these Task Orders. Here's how the Defendants describe those efforts in their undisputed statement of facts:

> 23. The 03-0077 Grant award's Extended Budget Description was modified to specifically describe the purpose for which BJCTA intended to use the remaining federal funds and local match. It outlined four facets of "Task Order 7," consisting of "Project Administration" ($52,184), "Comprehensive Operational Analysis" ($260,920), "Transit Development Plan" ($104,368), and "System Development Strategy" ($104,368). (Doc. 125-1 at 80.)

24. The 03-0058 Grant award's Extended Budget Description was also modified to specifically describe the purpose for which BJCTA intended to use the remaining $1,109,187 in federal funds and BJCTA's $277,297 local match. It outlined four facets of "Task Order 12," consisting of "Project Administration," "Data Collection and Analysis," "Environmental Documentation," and "Conceptual Design." (Doc. 125-1 at 49–50.)

25. Throughout the Fall of 2015 and early 2016, BJCTA consistently met with and received advice from FTA representatives regarding the above-mentioned grants, BJCTA's intended use of grant funds, the BJCTA's involvement with the BRT Project, and BJCTA's modification of existing grant funds across the scope of BJCTA's grant awards. (Doc 125-13 at 4, ¶ 11.)

(Doc. 135 at 10). These excerpts from the repurposed grants show some of the detail

that the BJCTA gave the FTA about Task Orders 7 and 12 during this process:

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5309 - Capital Program Grant and Loans | 5309 | 20500 | $1,109,187 |
| Non-FTA Amount | | | $277,297 |
| **Total Eligible Cost** | | | **$1,386,484** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Task Order 12 - 2.0 May 1, 2016 - September 30, 2017 | 9/30/2017 | Data Collection and Analysis: Socio-Demographic Data (the objective is to provide a comprehensive overview of BRT corridor focusing on demographics, economic conditions and land use patterns), Local and Regional Plans (the review of comprehensive plans, corridor plans, small area plans, and the regional long range transportation planning documents may yield additional pertinent data that can be utilized in the planning process), Historic Property and Cultural Resources Inventory (an inventory of historic properties and cultural resources will assist with identifying properties and resources that may be impacted and/or enhanced by the Birmingham BRT project) and Geographical Information Systems and Map Resources (the ability to display the data in a |

Task Order 7, 3.0 - Transit Development Plan - $104,368 for goals and objectives, performance measures, service modifications, vehicle specifications, bus stop standard details, service standards, implementation plan and financial plan.

Task Order 7, 4.0 - System Development Strategy - $104,368 for 3D visualization, video synopsis and production, first draft, revise and submit final plan document and plan delivery and adoption.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5309 - New Starts | 5309-5 | 20500 | $521,840 |
| Non-FTA Amount | | | $130,460 |
| **Total Eligible Cost** | | | **$652,300** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Task Order 7 - 1.0 March 1, 2016 - June 30, 2017 | 6/30/2017 | Project Administration: 3rd party contracted services for project management (detailed plan to include schedule and budget for advancing the project from concept to completion), project communications (detailed plan for engaging stakeholders which includes elected officials, business owners, and civic leaders during the plan development process), stakeholder involvement and public participation (detailed plan for engaging public in an interactive, two-way dialogue during the plan development process). |
| Task Order 7 - 3.0 October 1, 2016 - June 30, 2017 | 6/30/2017 | Transit Development Plan: for goals and objectives, performance measures, service modifications, vehicle specifications, bus stop standard details, service standards, implementation plan and financial plan. |

(Doc. 125-1 at 50, 80); *see also* (Doc. 125-1 at 577–82) (letters between Murdock and FTA representatives about the BRT Project and repurposing grants).

Plus, the BJCTA Defendants admit that, during this time, they certified their compliance with the Brooks Act and other procurement rules and regulations related to the BRT Project by uploading the Certifications and Assurances to the TrAMS system. (*See* Doc. 135 at 5–6, ¶¶ 3–10).

So it's not as if the BCJTA "merely demand[ed] payment" and gave the FTA no other information about the work to be compensated. *Escobar*, 579 U.S. at 188. The FTA knew what services Strada had provided when Walker uploaded the

payment request because the FTA and BJCTA worked together on securing the funding for those services. And as the Defendants admit, the FTA believed that the BJCTA was following the Brooks Act as it procured and compensated these services because the BJCTA was certifying its compliance each year.

In sum, the Defendants cannot rely on the FTA's labyrinthine system of web-based management to argue that the FTA did not know what work Strada was doing and did not know that BJCTA had assured its compliance with the Brooks Act. Because a reasonable juror could find the BJCTA "ma[de] specific representations about the goods or services provided" to the FTA, *Escobar*, 579 U.S. at 190, the court denies summary judgment for the BJCTA Defendants on Count III.

2. <u>The Strada defendants</u>: Relators allege that Strada and Watters violated Sections 3729(a)(1)(A–B) by making false records—particularly invoices, task orders, and the on-call contract—that were material to the BJCTA's implied false certification of compliance with the Brooks Act. (Doc. 155 at 33–34). While Strada and Watters moved for summary judgment (doc. 127), they adopted the BJCTA Defendants' brief in support rather than filing their own. (Docs. 136, 153). Neither BJCTA brief argues why Count III should be dismissed for the Strada Defendants particularly (rather than all Defendants generally), so the Relators may present their Count III claim against Strada and Watters at trial.

- **Count IV (reverse false claim)**

Section 3729(a)(1)(G)—also known as the "reverse false claim" provision—creates liability for anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Relators allege in Count IV that the BJCTA violated this section because it didn't pay back the grant money despite knowing that it had an obligation to return the money because it had violated the Brooks Act.

Defendants argue that they cannot have knowingly avoided an obligation to pay the grant monies back because they did not know or believe that they violated the Brooks Act (and still don't). Plus, this court has recently said that "in order for the concealment of an obligation to be actionable under the reverse false claim provision, the obligation must arise independent of the affirmative false claims that are actionable under the other FCA provisions." *United States ex rel. Wallace v. Exactech, Inc.*, No. 2:18-cv-1010-LSC, 2020 WL 4500493, at *21 (N.D. Ala. Aug. 5, 2020).

The court grants the BJCTA's motion for summary judgment on Count IV because there cannot be evidence of a known obligation to pay unless the FTA, United States, or this court orders the BJCTA to return the federal monies. *See id.*

40

- **Count V (conspiracy)**

Section 3729(a)(1)(C) creates liability for anyone who "conspires to commit a violation" of the other subsections. To state a claim under this section, Relators must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted). And the court has said that materiality (Element 3) is a jury question.

The court also finds that there is sufficient evidence to allow a reasonable juror to find that each defendant conspired with at least one other defendant and performed an act that furthered the conspiracy. As detailed in the Background, among other things, Relators present evidence that (a) each defendant knew about the BJCTA's duty to comply with the Brooks Act; (b) Strada signed its contract with the BJCTA before the BJCTA passed the resolution allowing contracts with all three firms; and (c) Strada wrote the self-awarding Task Orders and gave them to Murdock to sign.

- **Count VI (retaliation)**

Finally, Relator Culpepper—who was the BJCTA's contracting government affairs administrator—alleges that the BJCTA fired her because she complained to

Defendant Murdock, Chief of Staff Adrian Solomon, and others that the BJCTA's sole-source contracts with Strada violated the Brooks Act.

The FCA allows employees who were fired "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter" to sue their former employer for specified relief. 31 U.S.C. § 3730(h)(1). The Eleventh Circuit has said, "If an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee, then the complaint states a claim for retaliatory discharge under § 3730(h)." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

Retaliation claims are governed by a three-step, burden-shifting analysis. The court analyzes each step below, stating the facts in the light most favorable to Culpepper because the BJCTA (not Culpepper) seeks summary judgment.

**Step 1**: To prove a prima facie case, Culpepper must show that (1) the BJCTA must comply with the False Claims Act, (2) Culpepper engaged in protected activity, (3) Culpepper suffered adverse action, and (4) "there is an inference of causation between the protected activity and the adverse action." *Katterheinrich v. Al-Razaq Computing Servs.*, 2020 WL 5847648, No. 5:17-cv-1797-LCB, *4 (N.D. Ala. Oct.

1, 2020) (citation omitted). The parties agree that the BJCTA must comply with the FCA (element 1) and that the BJCTA fired Culpepper (element 3). So the disputed questions are whether Culpepper engaged in a protected activity and whether the BCJTA fired Culpepper because she engaged in that activity.

Protected Activity: Culpepper testified that, from October 2015 through February 2018, she complained to Murdock, Solomon, Perryman, and others that the BJCTA was violating the Brooks Act when it signed Strada's task orders. Here is how she described her conversation with Solomon in February 2018:

> A. I told Ms. Solomon that – well we frequently discussed it. But I told her on that date that it's really getting out of hand, the expenditures and the amount of documents that we're receiving that are no bid and on Strada letterhead. And I explained to her that there's no way we're sending RFPs for these individual tasks, and something has to be done.

(Doc. 125-25 at 26, p. 93:8–17). Culpepper also testified that she e-mailed herself documents "related to the things that I had been complaining about – the master agreement, certs and assurances, invoices, task orders, things alone those lines." (*Id.* at 70, p. 269: 13–18). Culpepper said she emailed herself those documents because "she was making sure that, you know, I had the documentation to support it." (*Id.* at 70, 270:15–20). A reasonable juror who views this evidence in a light most favorable to Culpepper could find that she acted "in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

Causal Link: Culpepper originally sued the BJCTA for race discrimination under Title VII but dismissed that lawsuit, she claims, because the discovery proved that the BJCTA fired her once it discovered that Culpepper was emailing herself the documents that would prove her complaints about the Brooks Act violations. (Doc. 125-25 at 269–70, p. 269:4–270:20). At that point, Culpepper claims, "[T]hey now know that, you know, it wasn't just me complaining. I was making sure that, you know, I had the documentation to support it." (*Id*.)

The BJCTA tries to break the causal link by saying that interim Executive Director Christopher Ruffin fired Culpepper after consulting with his superiors and that Ruffin did not know about Culpepper's complaints. Culpepper responds that, at his deposition, Ruffin twice testified that Solomon (who heard Culpepper complain) decided to fire Culpepper. (Doc. 125-3 at 29, pp. 107:22–23, 108:1–13). The BJCTA responds that Ruffin later testified that his superiors, not Solomon, ordered him to fire Culpepper (doc. 125-23 at 30, p.109:16–111:23) and that Solomon denied making the decision. (Doc. 125-17 at 28, 39). So the fact of who fired Culpepper is materially disputed and the court must assume that Culpepper's version of this fact is correct—*i.e.*, Solomon, who heard Culpepper complain about the Strada task orders, played some part in the decision to fire Culpepper.

The BJCTA argues that, even if Solomon made the decision, the gap in time between the last federally funded task order (May 2017) and Culpepper's firing (April 2018) breaks any connection between Culpepper's complaint and her firing. While the BJCTA is right that May 2017 was the last time it sought federal funds to pay Strada, it wasn't the last time Culpepper complained about it. In February 2018—just two months before she was fired—Culpepper says that she complained to Murdock, who in turn threatened Culpepper's job:

> A. I explained to her that we can't continue to do the contracts how she was doing the contracts with STRADA. And I expressed to her that it's a clear violation because BJCTA doesn't even send out anything on their letterhead. We just accept, or she accepts whatever STRADA gives her and signs off on it. And she informed me that – and reminded me, well, don't you need this good job and this insurance for your daughter?
>
> Q. When did –
>
> A. And I took that as a threat.

(Doc. 125-25 at 73, 283:3–15). Murdock denies this happened.

But even if it did, the BJCTA says that thanks to the nine-month gap between the last federally funded task order (May 2017) and this conversation, Culpepper's complaint in February 2018 "could not possibly have led anyone at BJCTA to fear liability." (Doc. 164 at 23, n.24). But Culpepper testified that the BJCTA discovered that she was emailing herself documents related to her Brooks Act complaints during

a forensic audit of employees' credit card usage in April 2018. Culpepper was suspended then fired that month.

If a reasonable juror views this evidence in a light most favorable to Culpepper, that juror could find that the BCJTA's discovery of the emails in April 2018, which were tied to Culpepper's earlier verbal complaints, caused the BJCTA to fire her. So the court finds that Culpepper can make a prima facie case.

**Step 2:** The BJCTA says that it fired Culpepper because the April 2018 audit showed that Culpepper used a company credit card for personal reasons. This is a legitimate nonretaliatory reason that satisfies the BCJTA's burden in Step 2.

**Step 3:** That means Culpepper must prove pretext; that is, she must prove both that (a) the BJCTA did not fire her because she misused a credit card and (b) the BJCTA actually fired her because it believed that she was acting "in furtherance of an action [under the False Claims Act]" or that she was making "other efforts to stop 1 or more violations of [the False Claims Act]." 31 U.S.C. § 3730(h); *see also Brooks v. Cty. Comm'n of Jefferson Cty.,* 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.").

The Eleventh Circuit has said that, on summary judgment, "the 'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not

violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1363 (11th Cir. 1999). Culpepper submits both types of evidence.

Culpepper offers evidence that the BJCTA Director, Ann August, approved her usage of the BJCTA credit card. Culpepper showed this evidence to Solomon at Solomon's deposition, and Solomon testified that she "didn't have any knowledge of the documents that you showed me with her signature signing off to consider at the time." (Doc. 125-17 at 33, p. 121:9–11). Solomon then testified that, had she known about this evidence, "I would have met with her and had a conversation. But it may not have been suspension." (*Id.* at 33, p. 122:12–17).

The BJCTA responds that, if Culpepper is right, she still fails to prove pretext because the person(s) who decided to fire her didn't know about August's approval; August left the BJCTA two years earlier. So while the BJCTA may have wrongly terminated Culpepper for misusing the credit card, that was still the reason they fired her—not Culpepper's complaints about the Brooks Act.

Based on the Eleventh Circuit's rule, the court finds that Culpepper has submitted enough evidence to show pretext. Again, all Culpepper has to do is "submit[] evidence" to show "that she did not violate the cited work rule[.]" *Damon*,

47

196 F.3d at 1363. She's done that, and if a reasonable juror views that evidence in a light most favorable to Culpepper, that juror could find that the BJCTA did not fire Culpepper because of her credit card use. The same reasonable juror could find instead find that the BJCTA fired Culpepper because it discovered that she was collecting documents that would prove her complaints about the Brooks Act and "could have feared being reported to the government for fraud or sued in a qui tam action by [Culpepper]." *Sanchez*, 596 F.3d at 1304. Because the court must assume the reasonable juror would view the evidence this way, the court must deny summary judgment.[5]

---

[5] Because the court finds that Culpepper's evidence that August approved her use of the credit card could prove pretext (if believed), the court needn't discuss Culpepper's argument that she could also prove that a similarly situated employee was not fired for using a company card. Culpepper may present that theory at trial.

## CONCLUSION

For these reasons, the court will enter a separate order that **DENIES** Relators' motion for partial summary judgment (doc 126); **GRANTS in PART** and **DENIES in PART** the BJCTA Defendants' motion for summary judgment (doc. 124) and the Strada Defendants' motion for summary judgment (doc. 127); and **DENIES as MOOT** Relators' motion to strike (doc. 105).

The parties should prepare to try these counts:

- **Count III**:  Implied False Certification Theory against all Defendants, limited to Task Orders 7, 7a, 7b 12 and 14;
- **Count V**:  Conspiracy to imply false certifications against all Defendants, limited to Task Orders 7, 7a, 7b 12 and 14; and,
- **Count VI**:  Retaliation against Starr Culpepper.

**DONE** on February 3, 2022.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE