

FILED

2022 Feb-28  PM 03:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., STARR CULPEPPER and** | ) | |
| **O. TAMEKA WREN,** | ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON** | ) | |
| **COUNTY TRANSIT** | ) | |
| **AUTHORITY (BJCTA),** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF THE CASE

---

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................ 1

II.    GOVERNING LEGAL STANDARDS ....................................... 1

III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A
       MATTER OF LAW ............................................................. 2

IV.    ARGUMENT ..................................................................... 6

       A.    Relators' Implied False Certification Theory In Count Three
             Fails As A Matter Of Law On Several Grounds. ................ 6

             1.    Specific Representation About Goods Or Services
                   Provided................................................................. 8

             2.    Materiality. ...........................................................16

       B.    Relators' Conspiracy Claim Fails Because There Is No
             Evidence Of An Agreement Between These Defendants And
             STRADA To Defraud The Government By Submitting A False
             Claim For Payment. ...........................................................21

       C.    Relators Cannot Establish That BJCTA And Murdock Had The
             Requisite Scienter To Violate The FCA. ...........................25

       D.    No Reasonable Juror Could Find For Culpepper On Her
             Retaliation Claim. ...........................................................34

             1.    Culpepper Did Not Engage In Protected Activity...................34

             2.    The Decision-Makers Were Not Aware Of Culpepper's
                   Alleged Protected Activity....................................................38

             3.    Temporal Proximity Is Lacking. ...........................40

             4.    Culpepper Cannot Establish Pretext. ......................42

             5.    The Issue Of Mental Anguish Damages Cannot Go To
                   The Jury...............................................................43

V.     OTHER GROUNDS.....................................................................................44

VI.    CONCLUSION ........................................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.  <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim .…'"  *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

### III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

3

C.      Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.   And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.      Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

**A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.**

### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

7

<u>representations</u> misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.     *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.   A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments. And it is in the claim itself where the specific representation must occur. There is no other place to look and be faithful to *Escobar's* command. BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests. This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit. For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment. By law, the Medicaid payees were required to have life care plans for their recipients. The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different. The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment. Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000. By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.* The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01. Those circumstances are not present here.

9

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.   "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to <u>specific representations</u> regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

11

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

12

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

### 2.   *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).   "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO.  But the FTA did not do any of that.  This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial."  First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services."  (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.)  During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA.   Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA.   The FTA also reviewed the STRADA

procurement file again in August 2019 as part of its broad Triennial Review, and

added an "enhanced review module" to the Triennial Review based, in part, on the

pending litigation against the BJCTA.   (*See* Trial Ex. 37.)   Despite all this

knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any

way whatsoever, did not assess a penalty or seek repayment of funds paid to

STRADA, and did not issue any written findings relating to the STRADA

procurement.   (*Id.* at 9, ¶ 27.)   All of this was not disputed by any witness, and

negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in

this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.   The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

## B.   Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

23

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at \*10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.   Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240." (Doc. 87 at 14). But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.* Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b). If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms." Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms. As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods. In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route. At least as to Task Orders 7

27

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded. WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then. Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts. These issues most frequently surface in administrative appeals of an agency's selection decision. There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published. *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added). Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*." *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders.  Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project.  STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text. We agree that a reviewing court could conclude that the Court's interpretation may be the correct one. The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*. Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

32

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge. BJCTA's officials did not agree with the positions she took. And, the evidence established that Culpepper was often entirely wrong. For example, when she first began making these remarks about sole-source contracts (in November 2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016. So, Culpepper's allegations of legal violations had no merit when she began making them. Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey. He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards. First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area. So, it proves nothing of relevance here. But like Relator Culpepper, he too was wrong about the task order he references. The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply. And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else. So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case.  Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react.  Thus, no scienter has been proven.

### D.   No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.   *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation.  Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began before STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

36

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] *See, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

## 2. The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant. There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3.    *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation. In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015. The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14] This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman*, 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions. This is antithetical to a retaliation claim.

employment action.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.,* No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action.  *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15]  The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018.  Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys.  Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later. To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.   *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card. Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary. Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

42

### 5. *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…."
*Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005). But
"compensatory damages for emotional distress may not be presumed for every
constitutional [or statutory] violation, but must be proven by competent, sufficient
evidence." *Id.   See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007)
("Compensatory damages for emotional distress and other intangible injuries are not
presumed from the mere violation of constitutional or statutory rights, but require
specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and
circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345
(quoting *Carey v. Piphus*, 435 U.S. 247 (1978)). "[A]lthough a plaintiff's testimony,
standing alone, can support an award of compensatory damages for emotional
distress …, 'the testimony must establish that the plaintiff suffered demonstrable
emotional distress, which must be sufficiently articulated; neither conclusory
statements that the plaintiff suffered emotional distress nor the mere fact that a
constitutional violation occurred supports an award for compensatory damages.'" *Id.*
(quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an
employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid
judgment as a matter of law).

Here, Culpepper has not presented **<u>any</u>** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **<u>one single question</u>** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   <u>OTHER GROUNDS</u>

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.    There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.    There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.    CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** <br> **ex rel., STARR CULPEPPER and** <br> **O. TAMEKA WREN,** | ) <br> ) <br> ) <br> ) | |
| **Relators/Plaintiffs,** | ) | |
| **v.** | ) <br> ) | **CIVIL ACTION NO.** <br> **2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON** <br> **COUNTY TRANSIT** <br> **AUTHORITY (BJCTA),** <br> **et al.,** | ) <br> ) <br> ) <br> ) <br> ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF THE CASE

---

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 1

II.   GOVERNING LEGAL STANDARDS ........................................... 1

III.  SUMMARY OF GROUNDS FOR JUDGMENT AS A
      MATTER OF LAW ..................................................................... 2

IV.   ARGUMENT ................................................................................ 6

      A.    Relators' Implied False Certification Theory In Count Three
            Fails As A Matter Of Law On Several Grounds. ................. 6

            1.    Specific Representation About Goods Or Services
                  Provided .................................................................. 8

            2.    Materiality. ............................................................16

      B.    Relators' Conspiracy Claim Fails Because There Is No
            Evidence Of An Agreement Between These Defendants And
            STRADA To Defraud The Government By Submitting A False
            Claim For Payment. ...........................................................21

      C.    Relators Cannot Establish That BJCTA And Murdock Had The
            Requisite Scienter To Violate The FCA. ...........................25

      D.    No Reasonable Juror Could Find For Culpepper On Her
            Retaliation Claim. ..............................................................34

            1.    Culpepper Did Not Engage In Protected Activity ...................34

            2.    The Decision-Makers Were Not Aware Of Culpepper's
                  Alleged Protected Activity. ......................................38

            3.    Temporal Proximity Is Lacking. ............................40

            4.    Culpepper Cannot Establish Pretext. .....................42

            5.    The Issue Of Mental Anguish Damages Cannot Go To
                  The Jury. .................................................................43

V.    OTHER GROUNDS........................................................................44

VI.   CONCLUSION ...........................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.     <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2). "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim ....'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc*., 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)). Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

### III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government.  There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

3

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.  And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

4

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

7

representations misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1. Specific Representation About Goods Or Services Provided.

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time. A "specific representation" in the claim itself is also needed.

> [W]e hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added). Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage. *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001. A naked claim for payment is not enough. But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

Case 2:18-cv-00567-CLM   Document 229   Filed 02/28/22   Page 61 of 588

form design were mere naked claims for payments. And it is in the claim itself where the specific representation must occur. There is no other place to look and be faithful to *Escobar's* command. BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests. This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit. For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment. By law, the Medicaid payees were required to have life care plans for their recipients. The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different. The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment. Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000. By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.* The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01. Those circumstances are not present here.

9

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to specific representations regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

11

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

13

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.   And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).   Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.   None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See, e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

## 2.   *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).   "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO.  But the FTA did not do any of that.  This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial."  First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services."  (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.)  During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA.  Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA. The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA. (*See* Trial Ex. 37.) Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement. (*Id.* at 9, ¶ 27.) All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review. The FTA

20

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- • Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.      Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).   General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.   While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).   Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546.   And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

23

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.  Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information."  *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services."  *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms." Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms. As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods. In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route. At least as to Task Orders 7

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based.*" *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders. Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project. STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

32

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

### D.    No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.    *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began before STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

36

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2. *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

38

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12]  Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant. There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3. *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation. In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015. The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14] This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman,* 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions. This is antithetical to a retaliation claim.

40

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.,* No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later. To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.   *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card. Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary. Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

**5.  *The Issue Of Mental Anguish Damages Cannot Go To The Jury.***

"A plaintiff may be compensated for intangible, psychological injuries…."
*Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But
"compensatory damages for emotional distress may not be presumed for every
constitutional [or statutory] violation, but must be proven by competent, sufficient
evidence."  *Id.   See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007)
("Compensatory damages for emotional distress and other intangible injuries are not
presumed from the mere violation of constitutional or statutory rights, but require
specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and
circumstances of the wrong and its effect on the plaintiff."  *Akouri*, 408 F.3d at 1345
(quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony,
standing alone, can support an award of compensatory damages for emotional
distress …, 'the testimony must establish that the plaintiff suffered demonstrable
emotional distress, which must be sufficiently articulated; neither conclusory
statements that the plaintiff suffered emotional distress nor the mere fact that a
constitutional violation occurred supports an award for compensatory damages.'"  *Id.*
(quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an
employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid
judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   OTHER GROUNDS

1.    There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.    There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.      There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.      There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.   CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., STARR CULPEPPER and** | ) | |
| **O. TAMEKA WREN,** | ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON** | ) | |
| **COUNTY TRANSIT** | ) | |
| **AUTHORITY (BJCTA),** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## AT THE CLOSE OF THE CASE

---

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................... 1

II.    GOVERNING LEGAL STANDARDS ........................................ 1

III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A
       MATTER OF LAW ................................................................ 2

IV.    ARGUMENT ......................................................................... 6

       A.   Relators' Implied False Certification Theory In Count Three
            Fails As A Matter Of Law On Several Grounds. ................................ 6

            1.   Specific Representation About Goods Or Services
                 Provided. ................................................................. 8

            2.   Materiality. ..............................................................16

       B.   Relators' Conspiracy Claim Fails Because There Is No
            Evidence Of An Agreement Between These Defendants And
            STRADA To Defraud The Government By Submitting A False
            Claim For Payment. ..........................................................21

       C.   Relators Cannot Establish That BJCTA And Murdock Had The
            Requisite Scienter To Violate The FCA. ....................................25

       D.   No Reasonable Juror Could Find For Culpepper On Her
            Retaliation Claim. ...........................................................34

            1.   Culpepper Did Not Engage In Protected Activity....................34

            2.   The Decision-Makers Were Not Aware Of Culpepper's
                 Alleged Protected Activity. ..........................................38

            3.   Temporal Proximity Is Lacking. ....................................40

            4.   Culpepper Cannot Establish Pretext. ...............................42

            5.   The Issue Of Mental Anguish Damages Cannot Go To
                 The Jury. ...............................................................43

V.    OTHER GROUNDS.......................................................................................44

VI.   CONCLUSION ..........................................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.    <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim .…'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.  And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

4

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass claims that make fraudulent misrepresentations which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

representations misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1. *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.   A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to <u>specific representations</u> regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at \*6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at \*4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at \*14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at \*8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

11

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar*'s restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

every single action taken by the organization. *See, e.g., U.S. v. Reunion Mortg., Inc.,* 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

## 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

16

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).   "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO. But the FTA did not do any of that. This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial." First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services." (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.) During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA. Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA.   The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA.   (*See* Trial Ex. 37.)   Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement.   (*Id.* at 9, ¶ 27.)   All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.   The FTA

20

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted). General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government. While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546. And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

23

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another. *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C.     Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.   Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflow Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services."  *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded. WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then. Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts. These issues most frequently surface in administrative appeals of an agency's selection decision. There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published. *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added). Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*." *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders. Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project. STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

### D.      No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.      *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began <u>before</u> STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

36

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2.   *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

39

changed testimony is irrelevant. There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3. *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation. In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015. The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14] This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman,* 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions. This is antithetical to a retaliation claim.

employment action.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action.  *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15]  The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018.  Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys.  Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later.  To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.   *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card.  Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary.  Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5.   *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).   But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."   *Id.*   *See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).   "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.     OTHER GROUNDS

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.    There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.    There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.    CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** ex rel., **STARR CULPEPPER and** **O. TAMEKA WREN,** | ) ) ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:18-cv-00567-CLM** |
| | ) | |
| **BIRMINGHAM-JEFFERSON** **COUNTY TRANSIT** **AUTHORITY (BJCTA),** **et al.,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

───────────────────────────────────────────

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF THE CASE

───────────────────────────────────────────

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................ 1

II.    GOVERNING LEGAL STANDARDS ....................................... 1

III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A
       MATTER OF LAW ................................................................... 2

IV.    ARGUMENT ............................................................................. 6

       A.    Relators' Implied False Certification Theory In Count Three
             Fails As A Matter Of Law On Several Grounds. ............................. 6

             1.    Specific Representation About Goods Or Services
                   Provided.................................................................. 8

             2.    Materiality. ............................................................16

       B.    Relators' Conspiracy Claim Fails Because There Is No
             Evidence Of An Agreement Between These Defendants And
             STRADA To Defraud The Government By Submitting A False
             Claim For Payment. ...........................................................21

       C.    Relators Cannot Establish That BJCTA And Murdock Had The
             Requisite Scienter To Violate The FCA. ...............................25

       D.    No Reasonable Juror Could Find For Culpepper On Her
             Retaliation Claim. ............................................................34

             1.    Culpepper Did Not Engage In Protected Activity....................34

             2.    The Decision-Makers Were Not Aware Of Culpepper's
                   Alleged Protected Activity.......................................38

             3.    Temporal Proximity Is Lacking. ............................40

             4.    Culpepper Cannot Establish Pretext. .......................42

             5.    The Issue Of Mental Anguish Damages Cannot Go To
                   The Jury.................................................................43

i

V.    OTHER GROUNDS......................................................................................44

VI.   CONCLUSION ...........................................................................................45

# I.  **INTRODUCTION**

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.  **GOVERNING LEGAL STANDARDS**

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim ....'"  *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

2

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

3

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.   And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

representations misleading with respect to the goods or services provided." *Id.*
(emphasis added).

### 1.    *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged

nondisclosure of a statutory, regulatory, or contractual violation made somewhere

else or at some other time.   A "specific representation" in the claim itself is also

needed.

> [W]e  hold that the implied certification theory can be a basis for
> liability, at least where two conditions are satisfied: first, **the claim
> does not merely request payment**, but also makes **specific
> representations** about the goods or services provided; and second, the
> defendant's failure to disclose noncompliance with material statutory,
> regulatory, or contractual requirements makes those **representations**
> misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).   Both conditions must be satisfied.

*United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL

4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.   *Escobar*

is clear that the focus under this theory of relief is on the claim itself, or more

specifically, the specific representations that were stated by the BJCTA in the claim.

*Escobar*, 136 S. Ct. at 2001.   A naked claim for payment is not enough.   But the

undisputed evidence presented in this case is that all BJCTA reimbursement claims

were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes.  *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

9

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **<u>claim</u>** not only requests payment but **<u>also</u>** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to <u>specific representations</u> regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

10

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

11

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar*'s restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

### 2.   *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted). "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996. This materiality standard is "demanding." *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

17

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government could decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA knew in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO.  But the FTA did not do any of that.  This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial."  First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services."  (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.)  During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA.  Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA.   The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA.   (*See* Trial Ex. 37.)   Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement.   (*Id.* at 9, ¶ 27.)   All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.   The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

21

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted). General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government. While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546. And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

23

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another. *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second

Amended Complaint should be dismissed with prejudice.[7]

### C.   Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the

requisite scienter.   Relators must present legally sufficient evidence "that the

defendant's violations were committed 'knowingly' – with actual knowledge that the

information was untrue or with deliberate ignorance or reckless disregard of the truth

or falsity of the information."   *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't

of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013)

(rejecting an FCA claim where the relator could not prove that the defendants knew

that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268

(4th Cir. 2014).   Like materiality, the scienter requirement is "rigorous" and strictly

enforced.   *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by

awarding STRADA "sole source/no bid" contracts in contravention of "competitive

bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240." (Doc. 87 at 14). But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.* Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b). If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based.*" *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders.  Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project.  STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

_____

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case.  Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react.  Thus, no scienter has been proven.

### D.   No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.   *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation.  Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

34

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began before STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]    Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] *See, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

> ### 2. *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12]   Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant.  There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3.      *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation.  In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action."  *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015.  The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14]  This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman,* 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14]  In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions.  This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later.  To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.    *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card.  Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary.  Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5.  *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.  See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.    OTHER GROUNDS

1.      There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.      There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.      There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.      There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.   CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** ex rel., **STARR CULPEPPER and O. TAMEKA WREN,** | ) ) ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:18-cv-00567-CLM** |
| | ) | |
| **BIRMINGHAM-JEFFERSON COUNTY TRANSIT AUTHORITY (BJCTA),** et al., | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF THE CASE

---

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

II.     GOVERNING LEGAL STANDARDS ...................................... 1

III.    SUMMARY OF GROUNDS FOR JUDGMENT AS A
        MATTER OF LAW ............................................................ 2

IV.     ARGUMENT ...................................................................... 6

        A.      Relators' Implied False Certification Theory In Count Three
                Fails As A Matter Of Law On Several Grounds. ............... 6

                1.      Specific Representation About Goods Or Services
                        Provided. .................................................... 8

                2.      Materiality. ..................................................16

        B.      Relators' Conspiracy Claim Fails Because There Is No
                Evidence Of An Agreement Between These Defendants And
                STRADA To Defraud The Government By Submitting A False
                Claim For Payment. ..........................................................21

        C.      Relators Cannot Establish That BJCTA And Murdock Had The
                Requisite Scienter To Violate The FCA. ..........................25

        D.      No Reasonable Juror Could Find For Culpepper On Her
                Retaliation Claim. ...........................................................34

                1.      Culpepper Did Not Engage In Protected Activity....34

                2.      The Decision-Makers Were Not Aware Of Culpepper's
                        Alleged Protected Activity. ...............................38

                3.      Temporal Proximity Is Lacking. ...........................40

                4.      Culpepper Cannot Establish Pretext. .....................42

                5.      The Issue Of Mental Anguish Damages Cannot Go To
                        The Jury. ....................................................43

V.  OTHER GROUNDS......................................................................................44

VI.  CONCLUSION .........................................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.    <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2). "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim ….'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)). Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

### III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

2

A.    Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.    Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.      Neither Defendant BJCTA nor Murdock can be liable under Relators'
implied false certification theory in Count Three for another reason.  Their alleged
noncompliance with the Brooks Act, the Master Agreement, and other laws,
regulations, or agreements were not material to the government's decision to pay
BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did
not conclude that a violation of the False Claims Act occurred.  Nor did the FTA
assess any penalties or demand that the BJCTA return any funds.  And, any
purported violation of the Brooks Act or other laws and regulations were minor or
insubstantial and, thus, not actionable under the False Claims Act.  There is no
evidence that (i) STRADA did not perform the work for which BJCTA submitted
claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that
WRA or Wendel could have better performed the services, or (iv) that WRA or
Wendel would have charged lower prices.  Thus, any failure to first negotiate with
WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is
not actionable under the FCA.

D.      Relators' conspiracy claim in Count Five fails as a matter of law
because there was no legally sufficient evidence of any conspiratorial agreement or
objective to get a false or fraudulent claim paid by the federal government.  BJCTA
and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

7

<u>representations</u> misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.    *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.   A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments. And it is in the claim itself where the specific representation must occur. There is no other place to look and be faithful to *Escobar's* command. BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests. This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit. For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment. By law, the Medicaid payees were required to have life care plans for their recipients. The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different. The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment. Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000. By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.* The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01. Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**. "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to specific representations regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added). *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

10

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

14

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

## 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).  "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.  Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO.  But the FTA did not do any of that.  This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial."  First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services."  (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.)  During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA.  Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA.   The FTA also reviewed the STRADA

procurement file again in August 2019 as part of its broad Triennial Review, and

added an "enhanced review module" to the Triennial Review based, in part, on the

pending litigation against the BJCTA.   (*See* Trial Ex. 37.)   Despite all this

knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any

way whatsoever, did not assess a penalty or seek repayment of funds paid to

STRADA, and did not issue any written findings relating to the STRADA

procurement.   (*Id.* at 9, ¶ 27.)   All of this was not disputed by any witness, and

negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in

this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.   The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid.  *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds.  *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'"  *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

## C.   Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.   Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inf] Inflow Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services."  *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

27

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms."  *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992).  Simply put, it should not "substitute its judgment for that of the agency evaluators."  *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here).  To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force.  Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders. Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project. STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.*  WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors.  The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds.  The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27).  And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA.  This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

33

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

### D.   No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.   *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity.  To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so.  And the False Claim Act requires a false claim; general allegations of fraud are not enough."  *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021).  Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing."  *Id.*  Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law.  Her own testimony demonstrates this.  She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015.  But she concedes these complaints began <u>before</u> STRADA was awarded a task order to be paid from federal funds.  The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016.  BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2.   The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

38

attorney Courtney French to terminate Culpepper's employment. It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment. Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA. The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim. *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant.  There is simply no evidence to link her alleged

complaints to various Board members to the decision-maker's decision to end her

employment.

### 3.      *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation.  In the

absence of any other evidence of causation, as is the case here, "a complaint of

retaliation fails as a matter of law if there is a substantial delay between the protected

activity and the adverse employment action."  *Scalone v. Home Depot U.S.A., Inc.*,

280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her

reported concerns that BJCTA was improperly awarding contracts to STRADA –

began, by her own admission, in November 2015.  The last "sole source contract"

(Task Order 24) involving federal funds was awarded by BJCTA to STRADA in

May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until

late April 2018, almost a year later.[14]  This lengthy delay defeats, as a matter of law,

any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman*, 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions.  This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.,* No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later. To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4. *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card. Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary. Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

**5.  *The Issue Of Mental Anguish Damages Cannot Go To The Jury.***

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.  See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   **OTHER GROUNDS**

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.      There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA. No witness testified that the BJCTA agreed to pay her that amount. Culpepper and her expert rely on speculation and guesswork on that subject.

4.      There is no legally sufficient evidence supporting any back-pay damages for the year 2021. Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes. But she failed or refused to provide this information before or during trial.

## VI.   <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel., STARR CULPEPPER and O. TAMEKA WREN,** | ) ) ) ) | |
| **Relators/Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. 2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON COUNTY TRANSIT AUTHORITY (BJCTA), et al.,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

──────────────────────────────────────────

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF THE CASE

──────────────────────────────────────────

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................... 1

II.   GOVERNING LEGAL STANDARDS ....................................... 1

III.  SUMMARY OF GROUNDS FOR JUDGMENT AS A
      MATTER OF LAW ............................................................... 2

IV.   ARGUMENT ....................................................................... 6

      A.    Relators' Implied False Certification Theory In Count Three
            Fails As A Matter Of Law On Several Grounds. ............... 6

            1.    Specific Representation About Goods Or Services
                  Provided................................................................. 8

            2.    Materiality. ...........................................................16

      B.    Relators' Conspiracy Claim Fails Because There Is No
            Evidence Of An Agreement Between These Defendants And
            STRADA To Defraud The Government By Submitting A False
            Claim For Payment. ..........................................................21

      C.    Relators Cannot Establish That BJCTA And Murdock Had The
            Requisite Scienter To Violate The FCA. ..........................25

      D.    No Reasonable Juror Could Find For Culpepper On Her
            Retaliation Claim. ............................................................34

            1.    Culpepper Did Not Engage In Protected Activity...................34

            2.    The Decision-Makers Were Not Aware Of Culpepper's
                  Alleged Protected Activity....................................................38

            3.    Temporal Proximity Is Lacking. ...........................40

            4.    Culpepper Cannot Establish Pretext. ......................42

            5.    The Issue Of Mental Anguish Damages Cannot Go To
                  The Jury.................................................................43

V.    OTHER GROUNDS.......................................................................44

VI.   CONCLUSION ...........................................................................45

# I. __INTRODUCTION__

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.    __GOVERNING LEGAL STANDARDS__

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim .…'"  *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.  And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

4

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

7

representations misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.    *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.  A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*.[1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to specific representations regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

13

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

### 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).   "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO. But the FTA did not do any of that. This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial." First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services." (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.) During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA. Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA.   The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA.   (*See* Trial Ex. 37.)   Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement.   (*Id.* at 9, ¶ 27.)   All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.   The FTA

20

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

21

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

22

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

24

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

## C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.  Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information."  *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

27

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*." *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based.*" *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders. Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project. STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

### D.    No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.    *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began <u>before</u> STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2.   *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment. It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment. Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA. The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim. *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant. There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3.     *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation. In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015. The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14] This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman,* 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions. This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later.  To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.    *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card.  Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary.  Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

## 5. *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.  See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.    OTHER GROUNDS

1.    There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.    There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.    There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.    There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.    CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., STARR CULPEPPER and** | ) | |
| **O. TAMEKA WREN,** | ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON** | ) | |
| **COUNTY TRANSIT** | ) | |
| **AUTHORITY (BJCTA),** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

─────────────────────────────────────────────

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## AT THE CLOSE OF THE CASE

─────────────────────────────────────────────

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   GOVERNING LEGAL STANDARDS ....................................... 1

III.  SUMMARY OF GROUNDS FOR JUDGMENT AS A
      MATTER OF LAW ............................................................. 2

IV.   ARGUMENT ..................................................................... 6

      A.    Relators' Implied False Certification Theory In Count Three
            Fails As A Matter Of Law On Several Grounds. ................. 6

            1.    Specific Representation About Goods Or Services
                  Provided ................................................................. 8

            2.    Materiality. ............................................................16

      B.    Relators' Conspiracy Claim Fails Because There Is No
            Evidence Of An Agreement Between These Defendants And
            STRADA To Defraud The Government By Submitting A False
            Claim For Payment. ..........................................................21

      C.    Relators Cannot Establish That BJCTA And Murdock Had The
            Requisite Scienter To Violate The FCA. ...........................25

      D.    No Reasonable Juror Could Find For Culpepper On Her
            Retaliation Claim. ...........................................................34

            1.    Culpepper Did Not Engage In Protected Activity ....................34

            2.    The Decision-Makers Were Not Aware Of Culpepper's
                  Alleged Protected Activity. ....................................38

            3.    Temporal Proximity Is Lacking. ............................40

            4.    Culpepper Cannot Establish Pretext. .....................42

            5.    The Issue Of Mental Anguish Damages Cannot Go To
                  The Jury. .............................................................43

V.    OTHER GROUNDS.....................................................................................44

VI.   CONCLUSION .......................................................................................45

# I.  __INTRODUCTION__

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.  __GOVERNING LEGAL STANDARDS__

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim ….'"  *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

### III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.    Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.    Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.      Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.   And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.      Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.    Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.    The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.    Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell.  Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA.  They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018.  These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid.  Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim.  In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).  The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added).  "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

<u>representations</u> misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1. *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.  A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to specific representations regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*.  The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders.  Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act.  But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act.  As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances.  She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system.  In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach.  The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case.  The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance."  *Id.* at 333.  And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted."  *Id*. at 333.  All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar*'s restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

### 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir.
2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud
statute or a vehicle for punishing garden-variety breaches of contract or regulatory
violations") (citations omitted).   "A misrepresentation about compliance with a
statutory, regulatory, or contractual requirement must be material to the
Government's payment decision in order to be actionable under the [FCA]."
*Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the
context of the FCA:

> A misrepresentation cannot be deemed material merely because the
> Government designates compliance with a particular statutory,
> regulatory, or contractual requirement as a condition of payment.  Nor
> is it sufficient for a finding of materiality that the Government would
> have the option to decline to pay if it knew of the defendant's
> noncompliance.   Materiality, in addition, cannot be found where
> noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants'
certifications of compliance with certain contractual provisions or government
regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in
*Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss
[FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]."
*Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO. But the FTA did not do any of that. This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial." First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services." (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.) During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA. Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA.    The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA.    (*See* Trial Ex. 37.)    Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement.    (*Id.* at 9, ¶ 27.)    All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.    The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

• Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm. Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA. Yet the FTA did not. Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision. *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

## B. Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA. To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

Case 2:18-cv-00567-CLM   Document 229   Filed 02/28/22   Page 319 of 588

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted). General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government. While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546. And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.  Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information."  *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Influw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

27

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded. WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then. Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts. These issues most frequently surface in administrative appeals of an agency's selection decision. There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published. *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added). Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*." *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

_____

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders.  Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project.  STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case.  Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react.  Thus, no scienter has been proven.

### D.    No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1.    *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation.  Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id*. Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began <u>before</u> STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016. So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims. For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds. All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government. This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process. Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA. It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]    Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

_____

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

## 2. *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

38

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant.  There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3. *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation.  In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015.  The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14]  This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman,* 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14]  In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions.  This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later.  To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.  *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card.  Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary.  Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5.  *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.*  *See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   OTHER GROUNDS

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.    There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.    There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.    CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br>**ex rel., STARR CULPEPPER and**<br>**O. TAMEKA WREN,** | ) <br> ) <br> ) <br> ) | |
| **Relators/Plaintiffs,** | ) | |
| **v.** | ) <br> ) | **CIVIL ACTION NO.**<br>**2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON**<br>**COUNTY TRANSIT**<br>**AUTHORITY (BJCTA),**<br>**et al.,** | ) <br> ) <br> ) <br> ) <br> ) | |
| **Defendants.** | ) | |

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## AT THE CLOSE OF THE CASE

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................... 1

II.    GOVERNING LEGAL STANDARDS ....................................... 1

III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A
       MATTER OF LAW ........................................................... 2

IV.    ARGUMENT ................................................................... 6

       A.    Relators' Implied False Certification Theory In Count Three
             Fails As A Matter Of Law On Several Grounds. ................ 6

             1.    Specific Representation About Goods Or Services
                   Provided.................................................... 8

             2.    Materiality. ................................................16

       B.    Relators' Conspiracy Claim Fails Because There Is No
             Evidence Of An Agreement Between These Defendants And
             STRADA To Defraud The Government By Submitting A False
             Claim For Payment. ......................................................21

       C.    Relators Cannot Establish That BJCTA And Murdock Had The
             Requisite Scienter To Violate The FCA. ...........................25

       D.    No Reasonable Juror Could Find For Culpepper On Her
             Retaliation Claim. .......................................................34

             1.    Culpepper Did Not Engage In Protected Activity...................34

             2.    The Decision-Makers Were Not Aware Of Culpepper's
                   Alleged Protected Activity....................................38

             3.    Temporal Proximity Is Lacking. ...........................40

             4.    Culpepper Cannot Establish Pretext. .......................42

             5.    The Issue Of Mental Anguish Damages Cannot Go To
                   The Jury...................................................43

V.    OTHER GROUNDS......................................................................................44

VI.   CONCLUSION .........................................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.   <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim . . . .'"  *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question."  *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

2

A.      Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment. Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim. Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.      Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts. She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government. Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.  And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

4

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.      Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.      The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.      Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

<u>representations</u> misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.   *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.   A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).   Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.   *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.   A naked claim for payment is not enough.   But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes.  *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id*. at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to specific representations regarding the services provided." *Id*. at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

12

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar*'s restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id.*, § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See, e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

### 2.  *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

16

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).  "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.  Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements."  *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO. But the FTA did not do any of that. This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial." First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services." (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.) During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA. Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

obtained any work from BJCTA. The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA. (*See* Trial Ex. 37.) Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement. (*Id.* at 9, ¶ 27.) All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review. The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

• Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

22

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6]  *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C.   Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.   Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information."  *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at \*4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at \*24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240." (Doc. 87 at 14). But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.* Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b). If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

27

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992).  Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here).  To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force.  Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders. Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project. STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

> **D.    No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.**

> **1.    *Culpepper Did Not Engage In Protected Activity.***

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity.  To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so.  And the False Claim Act requires a false claim; general allegations of fraud are not enough."  *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021).  Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing."  *Id*.  Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law.  Her own testimony demonstrates this.  She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015.  But she concedes these complaints began <u>before</u> STRADA was awarded a task order to be paid from federal funds.  The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016.  BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.   All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.   This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]    Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee*, *e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2.    *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12]  Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant.  There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3.    *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation.  In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action."  *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015.  The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14]  This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman*, 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14]  In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions.  This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later.  To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.     *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card.  Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary.  Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5. *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005). But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence." *Id.* *See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)). "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages." *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   OTHER GROUNDS

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.      There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.      There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.   <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel., STARR CULPEPPER and<br>O. TAMEKA WREN, | ) <br> ) <br> ) <br> ) | |
|        Relators/Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | CIVIL ACTION NO.<br>2:18-cv-00567-CLM |
| BIRMINGHAM-JEFFERSON<br>COUNTY TRANSIT<br>AUTHORITY (BJCTA),<br>et al., | ) <br> ) <br> ) <br> ) <br> ) | |
|        Defendants. | ) | |

**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
AT THE CLOSE OF THE CASE**

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................ 1

II.   GOVERNING LEGAL STANDARDS ...................................... 1

III.  SUMMARY OF GROUNDS FOR JUDGMENT AS A
      MATTER OF LAW ............................................................. 2

IV.   ARGUMENT ..................................................................... 6

      A.    Relators' Implied False Certification Theory In Count Three
            Fails As A Matter Of Law On Several Grounds. ................ 6

            1.    Specific Representation About Goods Or Services
                  Provided.................................................................. 8

            2.    Materiality. ............................................................16

      B.    Relators' Conspiracy Claim Fails Because There Is No
            Evidence Of An Agreement Between These Defendants And
            STRADA To Defraud The Government By Submitting A False
            Claim For Payment. .........................................................21

      C.    Relators Cannot Establish That BJCTA And Murdock Had The
            Requisite Scienter To Violate The FCA. ...........................25

      D.    No Reasonable Juror Could Find For Culpepper On Her
            Retaliation Claim. ...........................................................34

            1.    Culpepper Did Not Engage In Protected Activity..................34

            2.    The Decision-Makers Were Not Aware Of Culpepper's
                  Alleged Protected Activity.....................................38

            3.    Temporal Proximity Is Lacking. ...........................40

            4.    Culpepper Cannot Establish Pretext. .......................42

            5.    The Issue Of Mental Anguish Damages Cannot Go To
                  The Jury...............................................................43

i

V.     OTHER GROUNDS.......................................................................44

VI.    CONCLUSION ...........................................................................45

# I.  __INTRODUCTION__

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.   __GOVERNING LEGAL STANDARDS__

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2). "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim . . . .'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)). Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A. Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment. Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim. Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B. Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts. She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government. Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

3

C.    Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.  And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.    Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.    Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.    The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.    Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

7

representations misleading with respect to the goods or services provided." *Id.*
(emphasis added).

### 1.   *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged
nondisclosure of a statutory, regulatory, or contractual violation made somewhere
else or at some other time.   A "specific representation" in the claim itself is also
needed.

> [W]e  hold that the implied certification theory can be a basis for
> liability, at least where two conditions are satisfied: first, **the claim
> does not merely request payment**, but also makes **specific
> representations** about the goods or services provided; and second, the
> defendant's failure to disclose noncompliance with material statutory,
> regulatory, or contractual requirements makes those **representations**
> misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied.

*United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL
4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar*
is clear that the focus under this theory of relief is on the claim itself, or more
specifically, the specific representations that were stated by the BJCTA in the claim.
*Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the
undisputed evidence presented in this case is that all BJCTA reimbursement claims
were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

9

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **claim** not only requests payment but **also** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to specific representations regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at \*6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at \*4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at \*14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at \*8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*.  The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders.  Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act.  But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act.  As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances.  She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system.  In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

11

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

12

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

13

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

14

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

### 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).   "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

18

a check box for certifications (on any number of topics) when drawing funds down through ECHO. But the FTA did not do any of that. This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial." First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services." (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.) During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA. Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA. The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA. (*See* Trial Ex. 37.) Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement. (*Id.* at 9, ¶ 27.) All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review. The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- • Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm. Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA. Yet the FTA did not. Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision. *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA. To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

21

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

22

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second

Amended Complaint should be dismissed with prejudice.[7]

### C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the

requisite scienter.   Relators must present legally sufficient evidence "that the

defendant's violations were committed 'knowingly' – with actual knowledge that the

information was untrue or with deliberate ignorance or reckless disregard of the truth

or falsity of the information." *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't

of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013)

(rejecting an FCA claim where the relator could not prove that the defendants knew

that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268

(4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly

enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by

awarding STRADA "sole source/no bid" contracts in contravention of "competitive

bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

27

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded. WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then. Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts. These issues most frequently surface in administrative appeals of an agency's selection decision. There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published. *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added). Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*." *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based.*" *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders.  Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project.  STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge. BJCTA's officials did not agree with the positions she took. And, the evidence established that Culpepper was often entirely wrong. For example, when she first began making these remarks about sole-source contracts (in November 2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016. So, Culpepper's allegations of legal violations had no merit when she began making them. Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey. He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards. First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area. So, it proves nothing of relevance here. But like Relator Culpepper, he too was wrong about the task order he references. The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply. And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else. So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case.  Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react.  Thus, no scienter has been proven.

> **D.    No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.**

> **1.    *Culpepper Did Not Engage In Protected Activity.***

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation.  Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began before STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.   All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.   This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2.    The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment.    It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12]  Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant.  There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3.     *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation.  In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action."  *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015.  The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14]  This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman*, 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14]  In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions.  This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.,* No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later.  To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.    *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card.  Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary.  Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5. *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.   See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   OTHER GROUNDS

1.    There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.    There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.    There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.    There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.    CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., STARR CULPEPPER and** | ) | |
| **O. TAMEKA WREN,** | ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON** | ) | |
| **COUNTY TRANSIT** | ) | |
| **AUTHORITY (BJCTA),** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## AT THE CLOSE OF THE CASE

_____

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................... 1

II.  GOVERNING LEGAL STANDARDS ......................................... 1

III. SUMMARY OF GROUNDS FOR JUDGMENT AS A
     MATTER OF LAW ...................................................................... 2

IV.  ARGUMENT ................................................................................. 6

     A.   Relators' Implied False Certification Theory In Count Three
          Fails As A Matter Of Law On Several Grounds. ................................. 6

          1.   Specific Representation About Goods Or Services
               Provided.................................................................................. 8

          2.   Materiality. ...........................................................................16

     B.   Relators' Conspiracy Claim Fails Because There Is No
          Evidence Of An Agreement Between These Defendants And
          STRADA To Defraud The Government By Submitting A False
          Claim For Payment. ..........................................................................21

     C.   Relators Cannot Establish That BJCTA And Murdock Had The
          Requisite Scienter To Violate The FCA. ..........................................25

     D.   No Reasonable Juror Could Find For Culpepper On Her
          Retaliation Claim. .............................................................................34

          1.   Culpepper Did Not Engage In Protected Activity...................34

          2.   The Decision-Makers Were Not Aware Of Culpepper's
               Alleged Protected Activity....................................................38

          3.   Temporal Proximity Is Lacking. ...........................................40

          4.   Culpepper Cannot Establish Pretext. ....................................42

          5.   The Issue Of Mental Anguish Damages Cannot Go To
               The Jury.................................................................................43

V.    OTHER GROUNDS.....................................................................................44

VI.   CONCLUSION .......................................................................................45

# I.  **INTRODUCTION**

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.  **GOVERNING LEGAL STANDARDS**

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2). "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim .…'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc*., 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)). Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.   And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

4

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.    Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.    The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.    Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell.  Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA.  They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018.  These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid.  Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim.  In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).  The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions."  *Id.* at 1999 (emphasis added).  "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

7

<u>representations</u> misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.   *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.   A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes.  *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

9

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **<u>claim</u>** not only requests payment but **<u>also</u>** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to <u>specific representations</u> regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

13

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id.*, § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

14

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

## 2.   *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).  "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO.  But the FTA did not do any of that.  This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial."  First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services."  (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.)  During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA.  Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

obtained any work from BJCTA. The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA. (*See* Trial Ex. 37.) Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement. (*Id.* at 9, ¶ 27.) All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review. The FTA

20

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm. Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA. Yet the FTA did not. Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision. *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

**B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.**

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA. To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

22

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

23

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6]  *See Marsteller*, 2019 WL 4749986, at \*10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C.   Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter.   Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information."   *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014).  Like materiality, the scienter requirement is "rigorous" and strictly enforced.  *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained.  The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services."  *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992).  Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here).  To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force.  Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based.*" *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders. Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project. STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

33

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

### D. No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

#### 1. *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id*. Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began before STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

made until August 2016. So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims. For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds. All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government. This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process. Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA. It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

36

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] *See, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

## 2.   *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

38

attorney Courtney French to terminate Culpepper's employment.   It is also

undisputed that neither Ruffin nor Cunningham nor French knew anything at all

about Culpepper's complaints regarding STRADA, and that those complaints played

no role whatsoever in their decision to end her employment.  Even Culpepper herself

did not identify Ruffin or Cunningham or French as persons to whom she made

complaints regarding STRADA.  The decision-makers' complete lack of awareness

of the alleged protective activity is fatal to Culpepper's retaliation claim. *See Mack*

*v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation

claim failed as a matter of law where relator was unable to show the decision-maker

was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to

identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant.  There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3.    *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation.  In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015.  The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14]  This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman,* 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14]  In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions.  This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.,* No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later. To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.   *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card. Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary. Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5.  *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.  See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   **OTHER GROUNDS**

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.      There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.      There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.  CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　)
ex rel., STARR CULPEPPER and　)
O. TAMEKA WREN,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Relators/Plaintiffs,　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　)　　　　2:18-cv-00567-CLM
BIRMINGHAM-JEFFERSON　　　　　)
COUNTY TRANSIT　　　　　　　　)
AUTHORITY (BJCTA),　　　　　　)
et al.,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　)

---

# DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
## AT THE CLOSE OF THE CASE

---

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................ 1

II.    GOVERNING LEGAL STANDARDS ........................................ 1

III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A
       MATTER OF LAW ................................................................... 2

IV.    ARGUMENT ............................................................................. 6

       A.    Relators' Implied False Certification Theory In Count Three
             Fails As A Matter Of Law On Several Grounds. ............................... 6

             1.    Specific Representation About Goods Or Services
                   Provided. ...................................................................... 8

             2.    Materiality. ....................................................................16

       B.    Relators' Conspiracy Claim Fails Because There Is No
             Evidence Of An Agreement Between These Defendants And
             STRADA To Defraud The Government By Submitting A False
             Claim For Payment. ...........................................................21

       C.    Relators Cannot Establish That BJCTA And Murdock Had The
             Requisite Scienter To Violate The FCA. ............................................25

       D.    No Reasonable Juror Could Find For Culpepper On Her
             Retaliation Claim. .............................................................34

             1.    Culpepper Did Not Engage In Protected Activity...................34

             2.    The Decision-Makers Were Not Aware Of Culpepper's
                   Alleged Protected Activity. ...............................................38

             3.    Temporal Proximity Is Lacking. ...........................................40

             4.    Culpepper Cannot Establish Pretext. ...................................42

             5.    The Issue Of Mental Anguish Damages Cannot Go To
                   The Jury. ......................................................................43

V.  OTHER GROUNDS ..................................................................................44

VI.  CONCLUSION ...................................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.    <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2).  "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim .…'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)).  Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

### III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

2

A.    Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.    Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

3

C.    Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.  And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.    Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

4

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.     Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.     The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.     Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

## IV.   ARGUMENT

### A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.

#### *BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell. Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA. They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018. These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid. Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim. In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions." *Id.* at 1999 (emphasis added). "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

<u>representations</u> misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.    *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.  A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **<u>claim</u>** not only requests payment but **<u>also</u>** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to <u>specific representations</u> regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at \*10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*.  The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders.  Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act.  But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act.  As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances.  She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system.  In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

11

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

12

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar's* restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

13

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id.*, § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account.   There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA.  And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA).  Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government.  None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

## 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).   "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding." *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.   Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO. But the FTA did not do any of that. This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial." First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services." (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.) During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA. Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

obtained any work from BJCTA.   The FTA also reviewed the STRADA

procurement file again in August 2019 as part of its broad Triennial Review, and

added an "enhanced review module" to the Triennial Review based, in part, on the

pending litigation against the BJCTA.   (*See* Trial Ex. 37.)   Despite all this

knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any

way whatsoever, did not assess a penalty or seek repayment of funds paid to

STRADA, and did not issue any written findings relating to the STRADA

procurement.   (*Id.* at 9, ¶ 27.)   All of this was not disputed by any witness, and

negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in

this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review.   The FTA

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

### B.    Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds. *Id*. at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'" *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

23

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

## C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter. Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at \*4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014). Like materiality, the scienter requirement is "rigorous" and strictly enforced. *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained. The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflow Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at \*24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240." (Doc. 87 at 14). But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.* Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b). If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms."  Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms.  As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods.  In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route.  At least as to Task Orders 7

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

523 of 588

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders.  Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project.  STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with  or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text.  We agree that a reviewing court could conclude that the Court's interpretation may be the correct one.  The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*.  Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

###### D.   No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.

####### 1.   *Culpepper Did Not Engage In Protected Activity.*

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began <u>before</u> STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.   All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.   This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2. *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

38

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.   Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.   The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.   *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12] Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant. There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3. *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation. In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015. The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14] This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman*, 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions. This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later. To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4.    *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card. Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary. Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5. *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…."
*Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005). But
"compensatory damages for emotional distress may not be presumed for every
constitutional [or statutory] violation, but must be proven by competent, sufficient
evidence." *Id.* *See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007)
("Compensatory damages for emotional distress and other intangible injuries are not
presumed from the mere violation of constitutional or statutory rights, but require
specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and
circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345
(quoting *Carey v. Piphus*, 435 U.S. 247 (1978)). "[A]lthough a plaintiff's testimony,
standing alone, can support an award of compensatory damages for emotional
distress …, 'the testimony must establish that the plaintiff suffered demonstrable
emotional distress, which must be sufficiently articulated; neither conclusory
statements that the plaintiff suffered emotional distress nor the mere fact that a
constitutional violation occurred supports an award for compensatory damages.'" *Id.*
(quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an
employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid
judgment as a matter of law).

Here, Culpepper has not presented **any** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **one single question** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.    **OTHER GROUNDS**

1.    There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place. There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.    There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA. No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.    There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA. No witness testified that the BJCTA agreed to pay her that amount. Culpepper and her expert rely on speculation and guesswork on that subject.

4.    There is no legally sufficient evidence supporting any back-pay damages for the year 2021. Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes. But she failed or refused to provide this information before or during trial.

## VI.   CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel., STARR CULPEPPER and** | ) | |
| **O. TAMEKA WREN,** | ) | |
| | ) | |
| **Relators/Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:18-cv-00567-CLM** |
| **BIRMINGHAM-JEFFERSON** | ) | |
| **COUNTY TRANSIT** | ) | |
| **AUTHORITY (BJCTA),** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

―――――――――――――――――――――――――――――――――――――――――

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AT THE CLOSE OF THE CASE

―――――――――――――――――――――――――――――――――――――――――

Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews

Attorneys for Defendants
Birmingham Jefferson County Transit
Authority and Barbara Murdock

BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    GOVERNING LEGAL STANDARDS ....................................... 1

III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A
       MATTER OF LAW ............................................................... 2

IV.   ARGUMENT ....................................................................... 6

     A.     Relators' Implied False Certification Theory In Count Three
           Fails As A Matter Of Law On Several Grounds. ................................ 6

           1.     Specific Representation About Goods Or Services
                 Provided .................................................................... 8

           2.     Materiality. ................................................................16

     B.     Relators' Conspiracy Claim Fails Because There Is No
           Evidence Of An Agreement Between These Defendants And
           STRADA To Defraud The Government By Submitting A False
           Claim For Payment. ........................................................21

     C.     Relators Cannot Establish That BJCTA And Murdock Had The
           Requisite Scienter To Violate The FCA. .............................25

     D.     No Reasonable Juror Could Find For Culpepper On Her
           Retaliation Claim. ...........................................................34

           1.     Culpepper Did Not Engage In Protected Activity ................34

           2.     The Decision-Makers Were Not Aware Of Culpepper's
                 Alleged Protected Activity. ..........................................38

           3.     Temporal Proximity Is Lacking. ...................................40

           4.     Culpepper Cannot Establish Pretext. ..............................42

           5.     The Issue Of Mental Anguish Damages Cannot Go To
                 The Jury. ...................................................................43

V.    OTHER GROUNDS.......................................................................44

VI.   CONCLUSION .........................................................................45

# I.  <u>INTRODUCTION</u>

Under Rule 50(a) of the Federal Rules of Civil Procedure, Defendants, Birmingham Jefferson County Transit Authority ("BJCTA" or the "Authority") and Barbara Murdock ("Murdock"), request this Court to enter a judgment in their favor as a matter of law at the close of the Plaintiffs' evidence, dismissing all of Plaintiffs' claims with prejudice.  Plaintiffs failed to present sufficient evidence to meet the required elements of their claims.  There is no evidentiary basis to sustain any of Plaintiffs' substantive claim in Counts Three and Five that Defendants violated the False Claims Act ("FCA") in connection with the submission of claims to the Government for reimbursement.  Nor is there a sufficient evidentiary basis to sustain Plaintiff Culpepper's claims of retaliation (Count Six).

# II.    <u>GOVERNING LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 50(a) governs motions for judgment as a matter of law.  It provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2). "Judgment as a matter of law for a defendant is appropriate 'when there is insufficient evidence to prove an element of a claim . ...'" *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1099 (11th Cir. 2020) (citation omitted).

The standard governing motions for judgment as a matter of law is "well established" in the Eleventh Circuit:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Lipphardt v. Durango Steakhouse of Brandon, Inc*., 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988)). Plaintiffs, however, "must provide more than a scintilla of evidence that there is a substantial conflict in the evidence to support a jury question." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 701 (11th Cir. 1998).

## III.   SUMMARY OF GROUNDS FOR JUDGMENT AS A MATTER OF LAW

As more fully developed in the Argument section below, BJCTA and Barbara Murdock are entitled to a judgment as a matter of law under Rule 50(a) for the following reasons:

A.     Relators' implied false certification claim fails as a matter of law because there was no legally sufficient evidence that any Defendant made any false representations about the goods or services provided by STRADA in the reimbursement claims submitted to the government for payment.  Even if Relators are correct (they are not) that BJCTA or Murdock violated the Brooks Act in selecting STRADA as the "most highly qualified" A/E firm, that violation, standing alone, cannot sustain a False Claims Act claim.  Mere violations of government laws or regulations, without evidence of submission of a false claim for payment or reimbursement, are not enough to trigger False Claims Act liability.

B.     Defendant Murdock also cannot be liable under an implied false certification claim because there is no evidence that she presented a claim for payment to the federal government. There is also no evidence that she prepared, signed, or disseminated any certifications or assurances of compliance with the Brooks Act, executed a grant award or Master Agreement with the FTA, or otherwise personally certified compliance or the BJCTA's adherence to any federal contract laws, regulation, or contracts.  She did not have a TrAMS or ECHO account, and she did not personally submit any claims for reimbursement to the federal government.  Certifications or assurances made by other BJCTA employees cannot, as a matter of law, be imputed to her.

C.     Neither Defendant BJCTA nor Murdock can be liable under Relators' implied false certification theory in Count Three for another reason.  Their alleged noncompliance with the Brooks Act, the Master Agreement, and other laws, regulations, or agreements were not material to the government's decision to pay BJCTA's claims for reimbursement.  The FTA investigated BJCTA's actions and did not conclude that a violation of the False Claims Act occurred.  Nor did the FTA assess any penalties or demand that the BJCTA return any funds.   And, any purported violation of the Brooks Act or other laws and regulations were minor or insubstantial and, thus, not actionable under the False Claims Act.  There is no evidence that (i) STRADA did not perform the work for which BJCTA submitted claims for reimbursement, (ii) that STRADA overcharged for its services, (iii) that WRA or Wendel could have better performed the services, or (iv) that WRA or Wendel would have charged lower prices.  Thus, any failure to first negotiate with WRA or Wendel amounts, at most, to a minor or insubstantial violation, which is not actionable under the FCA.

D.     Relators' conspiracy claim in Count Five fails as a matter of law because there was no legally sufficient evidence of any conspiratorial agreement or objective to get a false or fraudulent claim paid by the federal government.  BJCTA and Murdock, moreover, cannot legally be guilty of conspiring with themselves or

with other BJCTA employees in connection with the alleged False Claims Act violations.

E.      Neither BJCTA nor Murdock can be liable under the False Claims Act because there is no legally sufficient evidence that either had the requisite scienter required to sustain a claim against them.  There is no legally sufficient evidence that these Defendants "knowingly" violated the False Claims Act – *i.e.*, that they had actual knowledge that any information they furnished in connection with a claim for reimbursement was untrue.  There is also no legally sufficient evidence that the BJCTA or Murdock were deliberately ignorant or acted in reckless disregard of the truth or falsity of any of the information.

F.      The BJCTA cannot be liable under Relator Culpepper's retaliation claim in Count Six as a matter of law.  Relator Culpepper did not engage in protected activity, and there is no legally-sufficient evidence that any of the decision-makers at the BJCTA who decided to discharge her were aware of her alleged protected activities.  There is also no legally sufficient evidence that Culpepper's allegedly protected activities occurred in a reasonable temporal proximity to her adverse employment action.  Finally, the evidence conclusively established that BJCTA had legitimate, non-pretextual reasons to discharge Culpepper.

G.      Culpepper's claim for mental anguish damages under Count Six should not go to the jury to decide. Culpepper has presented zero evidence of alleged mental

anguish – not even her own testimony. And mental anguish cannot be presumed from a mere statutory violation.

### IV.   ARGUMENT

**A.   Relators' Implied False Certification Theory In Count Three Fails As A Matter Of Law On Several Grounds.**

*BJCTA and Murdock*

This Court granted summary judgment against Plaintiffs and in favor of all Defendants on Count One (false presentment) and Count Two (false statement). (Doc. 206 at 33-34).   The Court concluded that Relators could not point to any evidence that the BJCTA's payment claims were "factually false or fraudulent." (*Id.* at 34).  The Court, however, reached a different result as to Count Three, the implied false certification theory of relief. (*Id.* at 34-39).

Relators' implied false certification claim closely tracks pre-*Escobar* cases that found a case for liability even when no representation about goods or services provided was contained in the claim for payment itself.  *See e.g.*, *United States ex rel. Ebeid v. Longivitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Prior to *Escobar*, in some circuits a relator could succeed in proving an FCA violation by alleging and proving that a defendant undertook to expressly comply with a law, rule, or regulation, and then submitted a claim for payment to the government even though the defendant was not in compliance with the law, rule, or regulation.  *Ebeid*, 616 F.3d at 998-99. The theory in *Ebeid* and other cases like it was that the very act of submitting a claim

6

for payment falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit.

That is the Relators' theory in a nutshell.  Relators cited to certain laws, regulations, and agreements imposing obligations on BJCTA.  They claim that the BJCTA did not comply with those obligations, but BJCTA falsely certified compliance with these legal obligations over various times in 2015–2018.  These alleged false certifications, Relators claim, violate the FCA because they supposedly resulted in claims being paid.  Their ultimate theory is that but for these certifications, the government would not have paid BJCTA's claims for reimbursement.

For years, courts split over whether the implied false certification theories like Relators' here were even actionable under the FCA, and, if so, what had to be proven to pursue the claim.  In 2016, the Supreme Court clarified the contours of a permissible implied false certification claim.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).  The Court observed that the term "false or fraudulent claims" is broad enough to "encompass <u>claims that make fraudulent misrepresentations</u> which include certain misleading omissions."  *Id.* at 1999 (emphasis added).  "When a defendant makes representations <u>in submitting a claim</u> but omits its violations of statutory, regulatory, or contractual requirements, these omissions can be a basis for liability if they render the defendant's

representations misleading with respect to the goods or services provided." *Id.* (emphasis added).

### 1.     *Specific Representation About Goods Or Services Provided.*

It is not enough after *Escobar* to simply link a claim for payment to an alleged nondisclosure of a statutory, regulatory, or contractual violation made somewhere else or at some other time.  A "specific representation" in the claim itself is also needed.

> [W]e  hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, **the claim does not merely request payment**, but also makes **specific representations** about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those **representations** misleading half-truths.

*Escobar*, 136 S. Ct. at 2001 (emphasis added).  Both conditions must be satisfied. *United States ex rel. Marsteller v. Tilton*, No. 5:13-cv-00830-AKK, 2019 WL 4749986, at *5 (N.D. Ala. Sept. 30, 2019).

Relators' implied false certification theory falters at this first stage.  *Escobar* is clear that the focus under this theory of relief is on the claim itself, or more specifically, the specific representations that were stated by the BJCTA in the claim. *Escobar*, 136 S. Ct. at 2001.  A naked claim for payment is not enough.  But the undisputed evidence presented in this case is that all BJCTA reimbursement claims were submitted through the FTA's ECHO System, which by the FTA's own claim

form design were mere naked claims for payments.  And it is in the claim itself where the specific representation must occur.  There is no other place to look and be faithful to *Escobar's* command.  BJCTA simply did not make any "specific representations" in those claims regarding the "services provided" by STRADA in connection with BJCTA's reimbursement requests.  This closes the door on any implied certification claim under *Escobar*. [1]

Several courts have adopted this view of *Escobar's* limitations, including the Eleventh Circuit.  For example, in *Ruckh v. Solus Rehabilitation, LLC*, 963 F.3d 1089 (11th Cir. 2020), the court focused on whether a Medicaid payment recipient violated the False Claims Act by submitting claims for payment.  By law, the Medicaid payees were required to have life care plans for their recipients.  The Relators claimed that the Medicaid payment recipients violated the FCA by not disclosing that they were in violation of the law concerning life care plans when they submitted payment claims.

---

[1] The situation in *Escobar* was different.  The Court in *Escobar* observed that the defendant in that case did more than just present a claim for payment.  Its claims for payment used "payment codes that corresponded to specific counseling services." 136 S. Ct. at 2000.  By using these codes, "Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" that corresponded with those codes. *Id.*  The failure to disclose to the government that the persons providing these services did not meet Medicaid requirements for training and experience needed to provide these services constituted misrepresentations actionable under the FCA. *Id.* at 2000-01.  Those circumstances are not present here.

After a jury verdict for Relators and a Rule 50(b) grant for the Defendants, the Eleventh Circuit partially affirmed the district court's order granting a motion to set aside a jury verdict. *Id.* at 1108-09. In addition to concluding that the presence of the life care plans were not material to the government's decision to pay claims, the Eleventh Circuit also focused on the lack of any specific representations about those plans **in the claims themselves**.  "[T]he implied certification theory of liability … can support a jury verdict only where the relevant **<u>claim</u>** not only requests payment but **<u>also</u>** 'makes specific representations about the goods or services provided.' Here the relator failed to connect the absence of care plans to <u>specific representations</u> regarding the services provided." *Id.* at 1109 (quoting *Escobar,* 136 S. Ct. at 2001) (emphasis added).  *Accord United States ex rel. Jameson v. Career Opportunities, Inc.*, No. 3:16-cv-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 1, 2020) (dismissing a relator's implied certification theory because there was no showing that defendants' claims for payment contained any representations about goods or services provided); *see also United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2021 WL 583506, at *4-6 (N.D. Cal. Feb. 16, 2021) (same); *United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, at *14 (D.D.C. Jan. 18, 2020) (same); *United States ex rel. Lewis v. Cal. Inst. of Tech.*, No. 2:18-cv-05964-CAS, at *8-9 (C.D. Cal. Oct. 10, 2019) (same); *United States ex rel. Carmen*

*Medrano v. Diabetic Care RX, LLC,* No. 15-cv-62617, 2018 WL 6978633, at *10 (S.D. Fla. Nov. 30, 2018) (same).

This case is just like *Ruckh*. The BJCTA is alleged to have violated an underlying legal obligation (the Brooks Act) by choosing STRADA for certain Task Orders. Relators say that this violation made the BJCTA's claim for reimbursement false because the claims omitted information about non-compliance with the Brooks Act. But like *Ruckh*, the claims made no specific representations about any goods or services provided by STRADA or any certifications of compliance with the Brooks Act. As she testified at trial, when Stephanie Walker submitted claims for reimbursement for STRADA invoices, she made no express certifications of compliance with the Brooks Act, or compliance with the FTA's master agreement or annual certifications and assurances. She did not provide STRADA's identity to the FTA, she did not make any statements regarding the type of services provided for the amount requested, or the procurement method used to secure the services of STRADA.

Indeed, by the FTA's own design, every single certification required by the FTA in connection with the entire grant program (master agreement, grant agreement, certifications and assurances, etc.) is housed in a separate database that is not linked in any way to the ECHO system. In short, at the time a claim for payment is submitted, the FTA does not ask for – and the BJCTA does not make –

any "specification representations about the goods or services provided" by STRADA, let alone any specific representations about compliance with the rules and regulations of the overarching program. Thus, because no such specific representations were made in the claims themselves, the Relators' claims fail as a matter of law under *Escobar* and *Ruckh*.

Courts across the country agree with this approach. The Ninth Circuit reached the same result in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), affirming summary judgment in an FCA case. The Ninth Circuit rejected a relator's implied false certification claim because "there is no evidence that Serco's public vouchers [the claims for payment] made any specific representations about Serco's performance." *Id.* at 333. And, as the Ninth Circuit noted, "[t]here is no evidence that [the Serco] employees failed to do the work for which [the government] had contracted." *Id.* at 333. All of this was fatal to the relator's implied false certification theory. *See also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii, LLC,* 512 F. Supp. 3d 1096, 1114 (D. Haw. 2021) ("merely submitting a claim is insufficient to state a valid implied false certification theory …. Rather, 'certification' and 'specific representations' are required."); *United States ex rel. Creighton v. Beauty Basics, Inc.*, No. 2:13-cv-1939-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016) (dismissing an implied false certification theory because

12

the claims submitted did not contain any specific representations about the goods or services provided).

*Escobar's* requirement that the specific representation about the goods or services provided must be contained in the claims themselves coincides with the express but limited aim of the FCA. The Act does not focus on fraudulent schemes or practices or underlying violations of governmental regulations in general – it instead trains on false claims for payment. *See Escobar*, 136 S. Ct. at 2004. Requiring a specific representation to be contained in the claim prevents expansion of the FCA beyond its intended scope, the concern *Escobar* sought to address, and a contrary rule would erode the well-established principle, recognized in *Escobar*, that not every breach of contract or regulatory violation is subject to the Act. *Escobar*, 136 S. Ct. at 2003 (the FCA is not "an all-purpose antifraud statute").

The Court may have concerns that adopting Defendants' view of *Escobar*'s restrictions on implied false certification claims would mean that the government has no remedy if the FTA believed the BJCTA did not comply with the Brooks Act. The Court should not harbor this concern. The Master Agreement between the FTA and the BJCTA allows the FTA to take several actions if it believes the BJCTA improperly received payments from federal grant funds. For example, Section 1(c) of the Master Agreement allows the FTA to bring an administrative enforcement action if it determines the BJCTA failed to follow applicable federal guidance. (Trial

Ex. 12, § 1(c)).  The FTA is also entitled under the Master Agreement (a) to impose penalties if it determined BJCTA incorrectly procured STRADA or made false certifications of compliance (*id*., § 4(f)(1)(c)), (b) audit the BJCTA under financial oversight or triennial reviews (*id.*, § 7(f)(7), and (c) to require BJCTA to pay any excess payments to disallowed costs, penalties, administrative charges, or other amounts due the government (*id.*, § 7(r)).  Clearly, then, the FTA would have several administrative or civil remedies if a material violation occurred.  But to recover under the FCA, the government or the Relators in its stead must meet the strict *Escobar* test.  This they did not do.

### *Murdock*

Defendant Murdock cannot be liable under an implied false certification claim for other reasons.  As the Court intends to charge the jury, the Relators must prove that: 1) Murdock presented a false claim for payment to the FTA; 2) Murdock knowingly presented the false claim; and, 3) Murdock's misrepresentation was material to the FTA's payment of the claim.  Further, the jury must find that Murdock "made specific representations to the FTA about the goods and services that STRADA provided the BJCTA."

The Relators' implied false certification claim against Murdock falters on at least element 1 and the requirement that Murdock made "specific representations" to the government about STRADA.  Murdock, personally, did not present any claims

for payment to the FTA through the ECHO system. She did not even have an ECHO account. There is also no evidence that Murdock expressly directed Stephanie Walker to submit claims for payment to the FTA.

Further, Murdock, personally, did not sign any master agreements with the FTA, any grant award agreements, or any annual certifications and assurances. Indeed, Murdock never even had a TrAMS account while at the BJCTA. And there is no evidence that Murdock expressly directed anyone to sign any of the foregoing documents (other than in her capacity as CEO of the BJCTA). Thus, even assuming, *arguendo*, that signatures on FTA agreements and the like constitute "specific representations" about the services provided by STRADA (they do not), Murdock did not make any such representations to the FTA, whether at the time of submitting a claim or otherwise.

The Relators' whole theory against Murdock is that she awarded task order agreements to STRADA in violation of the Brooks Act, and then approved payment of STRADA's invoices on those task orders from BJCTA funds prior to the BJCTA receiving any reimbursements from the government. None of that has anything to do with presentation of claims for payment through the ECHO system, or the making of misrepresentations to the FTA at the time a claim for payment is submitted. Moreover, the mere fact that Murdock was the director for the entire organization at the time claims were submitted is insufficient to render her personally liable for

15

every single action taken by the organization. *See*, *e.g.*, *U.S. v. Reunion Mortg., Inc.*, 2013 WL 5944252, at *1 (N.D. Cal. Nov. 5, 2013) (dismissing individual claims against corporation's president and co-owner, even though he signed annual certifications to the federal government, for failure to allege any conduct that would render him individually liable under the FCA).

In summary, the mere fact that Murdock allegedly violated the Brooks Act or acted as the Executive Director while a Brooks Act violation occurred (which is disputed in any event) is an insufficient evidentiary or legal basis to find that Murdock violated the False Claims Act on an implied false certification theory. Certifications or assurances made by other BJCTA employees, and claims submitted by other BJCTA employees, cannot, as a matter of law, be imputed to her.

## 2. *Materiality.*

While Relators' failure to meet Step 1 in *Escobar's* two-part test is enough, standing alone, to grant judgment as a matter of law on Count Three, the Relators have also failed to present sufficient evidence of materiality, Step 2 in *Escobar's* test.[2]

Once again, the "FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts …. Not every breach of a federal contract is a problem."

---

[2] "Materiality" is defined under the FCA to refer to statements "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

*United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010); *accord Escobar*, 136 S. Ct at 2003 (the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations") (citations omitted).  "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct at 1996.  This materiality standard is "demanding."  *Id.* at 2003.

The Supreme Court in *Escobar* explained what materiality meant in the context of the FCA:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.  Materiality, in addition, cannot be found where noncompliance is minor or unsubstantial.

*Escobar*, 136 S. Ct. at 2003.[3]

Relators have failed to present legally sufficient evidence that Defendants' certifications of compliance with certain contractual provisions or government regulations had any impact on the Government's decision to pay BJCTA's

---

[3] In addition to articulating these limits on the materiality standard, the Supreme Court in *Escobar* specifically rejected the notion that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss or at summary judgment [or here, on a Rule 50(a) motion]." *Id.* at 2004 n.6.

reimbursement claims.  The mere fact that the Government may have had the legal option to decline to pay if it knew of BJCTA's alleged noncompliance is not enough under *Escobar*.  *See Torricer*, 512 F. Supp. 3d at 1116 (alleging the possibility that the government <u>could</u> decline payment is not enough).  Relators also failed to present any legally sufficient evidence that any **Defendant knew** that "the Government refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirements."  *Escobar*, 136 S. Ct at 2003.[4]

The fact that compliance with procurement policies and procedures is not material to the FTA's decision to pay any one particular claim is evident from the manner in which the FTA has divorced the grantee certification and agreement process from the grantee payment process.  The FTA, by design, has two software systems: TrAMS and ECHO.  The systems do not overlap.  One system, TrAMS, houses all of the agreements made by the grant recipient.  The other system, ECHO, is where grant recipients request and receive payment.  The FTA certainly could have created one system for all grant-related activity (agreements and certifications as well as payments), or made links back to TrAMS in the ECHO system, or required

---

[4] The fact that the FTA clawed money back from the City of Birmingham in December 2018 cannot mean that BJCTA <u>knew</u> in 2016-2017, when STRADA was awarded Task Orders 7, 12, and 24, that the FTA would refuse to pay claims if the specific provision of the Brooks Act at issue here was violated.

a check box for certifications (on any number of topics) when drawing funds down through ECHO.  But the FTA did not do any of that.  This is evidence that the FTA does not intend to enforce compliance with its rules and regulations through the claims payment process, but through other methods.

The FTA's own actions (and inaction), moreover, demonstrate that the FTA did not view BJCTA's alleged non-compliance with the Brooks Act as "material" or "substantial."  First, as this Court noted in its summary judgment ruling, and as the evidence at trial established, the "FTA knew what services STRADA had provided" when BJCTA employees uploaded the ECHO claim forms "because the FTA and BJCTA worked together on securing funding for those services."  (Doc. 206 at 38-39).

Second, armed with this knowledge, between November 2018 and January 2019, the FTA extensively investigated the BJCTA's procurement relating to STRADA. (*See e.g.,* Trial Exs. 21-30, 404-407.)  During that investigation, the FTA reviewed RFQ 15-17, the evaluation matrices, the Board resolution approving three contracts, the three contracts issued to STRADA, Wendel, and WRA, and over fifty pages of task orders issued by BJCTA to STRADA.  Internal correspondence between FTA compliance employees demonstrates that the FTA became aware during the review that STRADA was only the "third highest ranked" proposer in response to the RFQ, and that it was not clear whether Wendel and WRA had

19

obtained any work from BJCTA. The FTA also reviewed the STRADA procurement file again in August 2019 as part of its broad Triennial Review, and added an "enhanced review module" to the Triennial Review based, in part, on the pending litigation against the BJCTA. (*See* Trial Ex. 37.) Despite all this knowledge, the evidence is undisputed that the FTA did not punish BJCTA in any way whatsoever, did not assess a penalty or seek repayment of funds paid to STRADA, and did not issue any written findings relating to the STRADA procurement. (*Id.* at 9, ¶ 27.) All of this was not disputed by any witness, and negates any finding of materiality as a matter of law.

In sum, the following points were conclusively established by the evidence in this case:

- No witness testified that the Defendants knew that the FTA routinely failed to pay claims where an A/E firm that was not the top-ranked firm in the qualifications round got the work.

- No witness from FTA testified regarding materiality of this alleged deviation from the Brooks Act.

- No witness testified that the FTA in practice actually denied claims where the top-ranked A/E vendor was not selected.

- No government witness, or any witness, testified that strict compliance with the selection process under the Brooks Act was of central importance to the FTA.

- The undisputed evidence established that the FTA reviewed the evidence and issues surrounding the STRADA procurement, once in 2018, and again in 2019 during the Triennial Review. The FTA

20

thereafter never instituted any efforts or claims to reimbursement of these grant funds paid to STRADA.

- Relators presented insufficient evidence that the FTA overlooked any of BJCTA's alleged deficiencies under the Brooks Act.

Contrast the FTA's inaction vis-à-vis the BJCTA to its treatment of the City of Birmingham. The City engaged in no qualification process whatsoever, so there was no basis to analyze whether STRADA was the most qualified A/E firm – it was the only A/E firm.  Simply put, if the FTA believed that BJCTA had committed a material violation of the law by awarding sole source contracts to STRADA instead to the other two qualified A/E firms, the FTA surely would have taken action against BJCTA.  Yet the FTA did not.  Therefore, no reasonable juror could conclude that the Relators' alleged violations of the Brooks Act (selecting STRADA as the "most highly qualified" of three indisputably qualified firms) were "material" to any payment decision.  *See Kelly*, 846 F.3d at 334-35; *Torricer*, 512 F. Supp. 3d at 1117; *accord United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).

## B. Relators' Conspiracy Claim Fails Because There Is No Evidence Of An Agreement Between These Defendants And STRADA To Defraud The Government By Submitting A False Claim For Payment.

Relators allege that these Defendants and STRADA violated § 3729(a)(1)(c) of the FCA, which prohibits conspiracies to violate the FCA.  To substantiate a claim for conspiracy under this section, Relators must present legally sufficient evidence "(1) that the defendant conspired with one or more persons to get a false or fraudulent

claim paid by the United States; (2) that one or more of the conspirators performed any acts to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).  General allegations of doing business with one another is not enough; a relator must "show that there was a meeting of the minds between two or more people to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Conspiracy claims, like all FCA claims, must center on an agreement between conspirators to get a false or fraudulent claim paid by the government.  While Relators do not have to prove an express agreement, they do have to show that Defendants at least shared a conspiratorial objective to get a false claim paid.  *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).  Silence, moreover, even in the face of the mention of one person's alleged objectives, is not enough to establish a conspiracy, a meeting of the minds.  *Id.* at 546.  And, finally, it is not enough to show that the alleged conspirators intended to violate an underlying regulation, or "'intended to engage in the conduct that resulted in the injury' to the government; rather the parties must be 'aware of the harm or wrongful conduct at the inception of the combination or agreement.'"  *United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D.

22

Pa. July 28, 204) (quoting *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 173 (5th Cir. 2000)), *aff'd*, 473 F.3d 506 (3d Cir. 2007); *Carlisle v. Daewon Kangup Co., Ltd.*, No. 3:15cv565-CDL, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (the agreement must be one to "cause false claims to be submitted to the government," not merely to engage in the underlying misconduct). *See also United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003) (plaintiff "must provide proof that [defendants] each intended to commit fraud and that they entered into an agreement with that specific objective."), *aff'd*, 384 F.3d 168 (5th Cir. 2004).

Relators entire evidentiary presentation was devoted to their theory that the BJCTA and/or Murdock violated the Brooks Act, and/or conspired to violate the Brooks Act. Even assuming, *arguendo*, that one or more defendants agreed to violate the Brooks Act, Relators have presented no evidence whatsoever that anyone "agreed to cause false claims to be submitted to the government." *Carlisle*, 2018 WL 3199148, at *5. Specifically, the evidence is unrebutted that the BJCTA paid STRADA with local funds, and later submitted claims for reimbursement to the FTA. There is no evidence whatsoever that STRADA knew anything about the claims process. There is not even any evidence that STRADA knew the BJCTA intended to claim reimbursements from the federal government after it made payments to STRADA from its own funds.

There is no also evidence that any STRADA employees or Barbara Murdock were involved in discussing or submitting false claims for reimbursement to the government; others at BJCTA (such as Stephanie Walker) handled the actual submission of reimbursements.[5]  Relators have not presented any legally sufficient evidence that Walker, or any other BJCTA employee involved in reimbursement requests, was involved in this purported conspiracy or even had any discussions with STRADA employees.  Nor is there any evidence that Murdock or other BJCTA employees, after meeting with STRADA's representatives, directed or instructed Walker to file false claims for reimbursement with the FTA. While STRADA, Murdock, and others at BJCTA met to discuss particular Task Orders, there simply is no evidence these discussions produced any "meetings of the mind" to defraud the government by submitting false claims for reimbursement, or by creating false records that were instrumental to receiving reimbursement through false claims.[6] *See Marsteller*, 2019 WL 4749986, at *10 (dismissing conspiracy claim where there was no evidence defendants conspired to get a false claim paid).  Defendants' Rule

---

[5] An actionable conspiracy under the FCA cannot be predicated on conspiratorial intent or actions taken by employees of the same entity.  An entity cannot legally conspire with its own employees under the FCA, nor can two employees conspire with one another.  *Hollins v. Fulton Cty.*, 422 F. App'x 828 (11th Cir. 2011).

[6] Relators certainly cannot point to the existence of a written contract between STRADA and BJCTA as proof of a conspiracy to submit a false claim.  BJCTA entered into virtually identical contracts with Wendel and WRA.

50 motion should be granted, and the conspiracy claims in Count Five of the Second Amended Complaint should be dismissed with prejudice.[7]

### C. Relators Cannot Establish That BJCTA And Murdock Had The Requisite Scienter To Violate The FCA.

A key element of any FCA case is proof that the defendant acted with the requisite scienter. Relators must present legally sufficient evidence "that the defendant's violations were committed 'knowingly' – with actual knowledge that the information was untrue or with deliberate ignorance or reckless disregard of the truth or falsity of the information." *United States ex rel. Ahumada v. Nat'l Ctr. for Empl't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (rejecting an FCA claim where the relator could not prove that the defendants knew that they had violated any statutory or regulatory requirements), *aff'd*, 756 F.3d 268 (4th Cir. 2014). Like materiality, the scienter requirement is "rigorous" and strictly enforced. *Escobar*, 136 S. Ct. at 2002.

Relators' core theory is that Murdock and BJCTA violated federal law by awarding STRADA "sole source/no bid" contracts in contravention of "competitive bidding protocols, procedures, and/or process" required by "the Brooks Act and/or

---

[7] Relators' conspiracy claim should also be dismissed because the underlying legal theories cannot be sustained. The law is clear that if the underlying FCA claims fail, a claim that defendants conspired to commit those violations also fails. *See United States ex rel. Lorona v. Inflaw Corp.*, No. 3:15-cv-959, 2019 WL 3778389, at *24 (M.D. Fla. Aug. 12, 2019); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

FTA Circular 4240."  (Doc. 87 at 14).  But the scienter requirement must train on something more specific – can Murdock or BJCTA be accused of knowingly submitting false claims for payment because they allegedly violated the Brooks Act by giving STRADA certain Task Orders, instead of first negotiating with WRA and/or Wendel?

The Brooks Act provides that, for each proposed A&E project, a federal agency head shall evaluate current statements of qualifications and performance data. 40 U.S.C. 1103(c). "The agency head shall conduct discussions with at least 3 firms to consider anticipated concepts and compare alternative methods for furnishing services." *Id.*  Then, "[t]he agency head shall negotiate a contract … which the agency head determines is fair and reasonable to the Federal Government …. The agency head shall attempt to negotiate a contract … with the most highly qualified firm selected under section 1103 of this title." 40 U.S.C. 1104(a), (b).  If negotiations with that firm fall through, the negotiations should be "formally terminated," and negotiations undertaken with "the next most qualified of the selected firms, continuing the process until an agreement is reached." *Id.* at 1104(b).

The key underpinning of Relators' case is that, because WRA received the highest numerical ranking during the RFQ 15-17 qualification process conducted by outside valuators, BJCTA was required to first negotiate each and every task order with WRA, and could only negotiate with STRADA if negotiations with WRA and

26

then Wendel, the second most qualified, fell through. In other words, because STRADA received the third highest numerical ranking in the initial qualification process (as determined by three non-BJCTA evaluators) -- not the "agency head" -- BJCTA could not just contract with STRADA on any particular task order. Therefore, Relators urge, BJCTA violated federal law by selecting STRADA as the entity with whom it would first negotiate and to whom it awarded task orders.

Relators' theory fails, first, because it ignores a crucial step in the process – the conducting of "discussions with at least 3 firms." Here, it is undisputed that the independent evaluators merely narrowed down the five responders to the top three firms, and did not have any discussions with the top three firms. As such, the decision as to which firm was the "most highly qualified" could not have been made by the independent evaluators, before any discussions were had about anticipated concepts and alternative methods. In other words, WRA was not "the most highly qualified" firm, as that term is used in the Brooks Act, merely because it scored the highest during the independent evaluation.

Relators' theory fails, second, because it ignores the discretion given to agencies to select the entity it perceives to be best suited for the task at hand, specifically, and in the context of government contractual awards, generally. Relators contend that BJCTA was automatically obligated to negotiate first with WRA – it had no discretion to take a different route. At least as to Task Orders 7

and 12, this argument fails because WRA had not even signed the contract sent to it by the BJCTA at the time those Task Orders were awarded.  WRA got a draft of the contract in January 2016, but did not sign the contract until June 2016; Task Orders 7 and 12 had already been assigned by then.  Also, Wendel did not sign its contract until after these Task Orders were issued.

But even laying this important point to the side, Relators' wooden, mechanical view runs counter to established precedent in the context of awarding government-related contracts.  These issues most frequently surface in administrative appeals of an agency's selection decision.  There, in determining the "most highly qualified" firms, reviewing tribunals have uniformly concluded that entities such as BJCTA have "*broad discretion* in determining the relative importance of [the] criteria" established and published.  *See* 2 Government Contract Awards: Negotiation and Sealed Bidding § 22:5 (emphasis added); *see also* 70 Am. Jur. Proof of Facts 3d 97 (noting that "the terms … 'best qualified,' 'most qualified,'… and the like are … often *based upon the discretion of the agency officials* in charge of the competitive bidding process") (emphasis added).  Said another way, "the evaluation of [a] firm's qualification statement [to determine whether it is a "most highly qualified" firm is *within the discretion of the agency*."  *See In re Reid Plan, Inc.*, B-412942, 2016 WL 4205338, at *3 (Comp. Gen. July 8, 2016) (emphasis added).

Given this broad discretion, when reviewing an agency's A/E firm selection, a reviewing tribunal should not "reevaluate the offeror's capabilities or . . . make [its] own determination of the relative merits of competing firms." *See In re Artel, Inc.*, B-248478, 1992 WL 208692, at *2 (Comp. Gen. Aug. 21, 1992). Simply put, it should not "substitute its judgment for that of the agency evaluators." *See Weston Sols., Inc. v. United States*, 95 Fed. Cl. 311, 321 (2010) ("[T]he court … may not substitute its judgment for that of the agency, but rather must confine its review to determining whether the agency's decision was arbitrary and capricious."), *aff'd,* 440 F. App'x 926 (Fed. Cir. 2011); *Reid*, 2016 WL 4205338, at *3 ("In reviewing a protest …, our Office will not substitute its judgment for that of the agency evaluators.").[8]

Indeed, courts have explicitly found that it is *not* reasonable to choose the "most highly qualified firm" by merely tallying up a proposer's qualifications (as Relators suggest BJCTA should have done here). To illustrate, in *In re Evergreen JV*, B-418475.4, 2020 WL 5798042 (Comp. Gen. Sept. 23, 2020), an A/E firm, Evergreen, filed a protest after it was not awarded an A/E services contract from the Air Force. Evergreen challenged the selection process, arguing that the Air Force

---

[8] An agency's selection decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Weston*, 95 Fed. Cl. at 321 (citation omitted). In other words, the relevant issue is "whether the agency's selection was *reasonable* and in accordance with the published criteria." *Reid*, 2016 WL 4205338, at *3 (emphasis added).

impermissibly used "a mechanical, quantitative comparison ... which did not properly consider Evergreen's qualifications" when the Air Force simply totaled up the number of criteria that each firm met, and deemed the highest scorer the "most qualified." *Id.* at 4. The GAO agreed that this method was inappropriate, reasoning that "[t]his simple counting of instances … does not consider the greater extent and breadth of each offeror's experience in each of the projects .... *Accordingly, the mechanical comparison, without a qualitative comparison of offerors, is … not reasonably based*." *Id.* at *7 (emphasis added); *see also Weston*, 95 Fed. Cl. at 326 (rejecting argument that an agency failed to evaluate each "criterion using some type of rating method" where the agency argued that it has "broad discretion to determine what type of qualitative method to use" and that "the type of formulaic numerical scoring the [firm] suggests" was not permitted under the applicable regulations).

Here, the evidence establishes that STRADA was a reasonable selection for Task Order Nos. 7, 7a., 7b., 12, and 24, and, in the BJCTA's view, the "most highly qualified" A/E firm for those particular task orders.  Among other things, the evidence established that those task orders required coordination and interaction with the major stakeholders of the BRT Project, and detailed working knowledge of the BRT Project.  STRADA was uniquely suited to meet those requirements due to STRADA's work for the City of Birmingham and involvement with the BRT Project

throughout 2015, as well as its partnership with the City, the RPC, and BJCTA on the BRT Project. *Id.* WRA and Wendel were not.

BJCTA and Murdock, moreover, did not come to their decision to select STRADA unaided by any advice. As explained by Murdock, the BJCTA's management of the firms selected through RFQ 15-17 was reviewed and approved by attorneys to BJCTA's Board of Directors. The lawyers for the BJCTA signed off on all procurement matters, and prior to their sign-off, these lawyers provided information regarding how to proceed under the Brooks Act.

In its summary judgment order, this Court engaged in a long and thoughtful analysis of what Sections 1103 and 1104 of the Brooks Act require of an agency head in selecting an A/E firm to provide services paid with federal funds. The Court reached out to statutory interpretation texts and case law about how a statute should be construed, (Doc. 206 at 20-25), as well as policy grounds for its decision. (*Id.* at 25-27). And, after acknowledging that its "reading of the Brooks Act is less efficient than the Defendants' reading," (*id.* at 26), the Court nevertheless came to the conclusion that the better-reasoned construction of the Brooks Act was that BJCTA had to first negotiate with WRA, then Wendel, before it would negotiate with or provide any task orders to STRADA. This, even though, as stated above, there were objective reasons why STRADA, given its knowledge of and central involvement in the BRT project, was more qualified than the other two.

31

But, the crucial point is not who's right and who's wrong in discerning the meaning of the Brooks Act's statutory text. We agree that a reviewing court could conclude that the Court's interpretation may be the correct one. The central issue in an FCA case, however, is whether a defendant's different interpretation (even if wrong) is enough to prove *scienter*. Courts have routinely refused to saddle FCA defendants with guilty scienter where those decisions were based on statutory interpretations – even wrong ones. *See, e.g., United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) (actions taken in a reasonable but mistaken interpretation of contractual or regulatory requirements will not establish the scienter element of the FCA); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) (where defendants believed they complied with the law, or took advantage of a disputed legal question, they "were neither deliberately ignorant nor recklessly disregardful," so scienter was not established); a*ccord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 658 n.39 (5th Cir. 2017) (recognizing principle that where statutory text and relevant guidance would allow for more than one reasonable interpretation, a court should not treat "a defendant who merely adopts one such interpretation as a knowing or reckless violator.") (citation omitted); *United States ex rel. Sheet Metal*

*Workers Int'l Assoc. v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016) (negligent or mistaken actions are not enough).[9]

Relator Culpepper's testimony, that she made several complaints to BJCTA management about providing sole-source task orders to STRADA, doesn't establish BJCTA and Murdock had guilty knowledge.  BJCTA's officials did not agree with the positions she took.  And, the evidence established that Culpepper was often entirely wrong.  For example, when she first began making these remarks about sole-source contracts (in November  2015), STRADA had not even been awarded any task orders that would be paid with federal grant funds – that did not happen until March 2016.  So, Culpepper's allegations of legal violations had no merit when she began making them.  Incorrect charges of federal law violations is certainly not a sufficient basis to conclude that the BJCTA thereafter knowingly submitted false claims for payment in violation of the FCA.[10]

---

[9] *See also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 957-58 (10th Cir. 2008) (actions taken based on disputed legal issues or vague provisions or regulations do not constitute knowing violations of the FCA); *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767-68 (8th Cir. 2002) (same).

[10] The same holds true for the email from WRA's Jim Ritchey.  He too opined that a BJCTA task order proposal violated the Brooks Act procurement standards.  First, the Ritchey email had nothing to do with the Brooks Act ranking process, the meaning of the term "most highly-qualified," or whether an agency head like Murdock has any discretion in this area.  So, it proves nothing of relevance here.  But like Relator Culpepper, he too was wrong about the task order he references.  The evidence established that the specific task order at issue was to be paid with local funds, not federal funds, so the Brooks Act did not even apply.  And, the issue Ritchey addressed was not even covered by the 15-17 Procurement; it involved something else.  So, his email is much ado about nothing.

In the final analysis, with no evidence that the FTA regarded the disputed actions of the BJCTA as a violation of the Brooks Act, establishing that the BJCTA and Murdock acted with the requisite scienter is not possible under the evidence in this case. Because the Relators presented no legally sufficient evidence of how the FTA would actually address the precise claim here (*i.e.*, it would require the BJCTA to repay reimbursement if the BJCTA picked the wrong A/E firm to get Task Orders), they necessarily failed to establish the essential element that these Defendants knew how the government would react. Thus, no scienter has been proven.

**D.    No Reasonable Juror Could Find For Culpepper On Her Retaliation Claim.**

**1.    *Culpepper Did Not Engage In Protected Activity.***

The FCA recognizes two types of protected activity: (1) "lawful acts done by the employee … in furtherance of an action under [the FCA];" or (2) "other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). Here, Relator Culpepper did file an FCA action **under seal** prior to her termination from BJCTA. But there is no evidence that anyone at BJCTA was aware of this sealed filing before her termination, or was aware that Relator Culpepper ever intended to pursue FCA litigation. Thus, Culpepper had to show that her alleged internal complaints regarding task orders issued to STRADA constituted "protected activity" under the FCA.

Here, Relator Culpepper has not presented sufficient evidentiary proof that she engaged in protected activity. To engage in protected activity under the FCA, the employee must show "that the activity [she] was fired over had something to do with the False Claims Act – or at least that a reasonable person might have thought so. And the False Claim Act requires a false claim; general allegations of fraud are not enough." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021). Thus, while an employee may suspect her employer may have committed "any number of legal or ethical violations," the FCA's retaliation provision only comes into play "where the suspected misdeeds are violations of the False Claims Act, not just general principles of ethics and fair dealing." *Id.* Even if an employee suspects fraud, that is not enough – she must suspect a false claim for payment to the government. *Id.*

Culpepper cannot meet this heightened standard as a matter of law. Her own testimony demonstrates this. She testified that she began complaining about BJCTA's awarding to STRADA what she called sole source contracts in November 2015. But she concedes these complaints began before STRADA was awarded a task order to be paid from federal funds. The first two task orders given to STRADA that would ultimately be paid with federal funds (Nos. 7 and 12) were awarded to STRADA in March 2016. BJCTA's first requests for reimbursement from the federal government for STRADA invoices related to those two task orders were not

35

made until August 2016.  So, there's no real connection between Relator Culpepper's complaints about purported Brooks Act violations and any alleged <u>false claims</u> for payment. General allegations of legal violations, untethered to a False Claims Act violation, is not enough under *Hickman*.

Culpepper, moreover, continued complaining about sole source contracts being awarded to STRADA regardless of whether federal funds were used to pay BJCTA's reimbursement claims.  For example, her last complaint on this topic occurred in February 2018, but it is undisputed this complaint related to Task Order No. 30, which was paid with local (not federal) funds.  All of this testimony demonstrates that Culpepper was complaining about general business practices (*i.e.*, alleged Brooks Act violations and, presumably, state bid law breaches), not specific fraudulent claims for payment submitted to the federal government.  This is buttressed by the fact that she conceded at trial that she had no involvement in the claims preparation or submittal process.  Her retaliation claim, therefore, fails as a matter of law because her so-called protected activities were not tied to efforts to stop a false claim for payment.

Additionally, in light of Culpepper's job duties, no reasonable person would have thought that Culpepper's complaints implicated the FCA.  It is undisputed that Culpepper's job duties as Contracts Administrator involved the development of compliance documents, and ensuring BJCTA's compliance with applicable federal

36

regulations in the procurement process.[11]   Thus, no reasonable person could construe Culpepper's internal complaints regarding the alleged awarding of sole-source contracts to STRADA as a warning that she was contemplating an FCA action, or actively trying to stop the submission of false claims. At most, Culpepper's complaints identified non-compliance with certain regulations. Culpepper conceded at trial that she never mentioned "false claims" or the FCA, specifically, or even that she mentioned the concept of "fraud" on the government, or the BJCTA's receipt of funds to which it was not entitled. Culpepper also did not present legally sufficient evidence that she threatened to report the BJCTA to the federal government, or to file an FCA-suit against the BJCTA.

In this vein, multiple courts have recognized that a compliance employee's act of reporting an alleged violation of a rule or regulation does not constitute protected activity because it is not sufficient to put an employer on notice that the report implicates the FCA. *See, e.g., United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 767-68 (10th Cir. 2019) (affirming dismissal of retaliation claim, stating: "a compliance employee must allege facts … mak[ing it] clear that her

---

[11] S*ee, e.g.*, Trial Ex. 87 at BJCTA 0000183 (containing job duties such as "[a]ssist[ing] in the development of … procurement, and compliance documents to ensure [sic] compliance with federal, state and BJCTA regulations and policies," and "keep[ing] the Executive Director … aware of anything that may need attention"); Trial Ex. 87 at BJCTA 0000148 ("[r]esponsib[ility] for ensuring the organization follows FTA Circular 42201F – Third Party Contracting Regulations," "[a]dvis[ing] … staff on procurement methods, procedures, and rationale[,]" and maintain[ing] and monitor[ing] compliance with established standards").

employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job"); *Sealed Appellant I v. Sealed Appellee I,* 156 F. App'x 630, 634-35 (5th Cir. 2005) (affirming dismissal of FCA retaliation claim); *Clark v. Healthsouth Corp.*, No. 8:14-cv-778, 2021 WL 149265, at *5-6 (M.D. Fla. Jan. 21, 2021) (finding concerns raised by medical director would not put employer on notice that medical director's actions were motivated by a desire to prevent FCA violations); *Frett v. Howard Univ.*, 24 F. Supp. 3d 76, 86-87 (D.D.C. 2014) ("When an employee engages in reporting activities that could be mistaken for routine actions in accordance with [her] employment obligations…courts have ruled as a matter of law that the employer could not have known that the employee's actions might lead to FCA charges.") (citations omitted).

### 2. *The Decision-Makers Were Not Aware Of Culpepper's Alleged Protected Activity.*

Even if Culpepper's complaints about noncompliance with laws or regulations constituted "protected activity," Culpepper still loses on her retaliation claim. "To establish the necessary causal connection under § 3730(h)(1), the plaintiff **must** present legally-sufficient evidence that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (emphasis added). Here, the evidence established that there was a group decision between Chris Ruffin, Board Chairman Darryl Cunningham, and Board

attorney Courtney French to terminate Culpepper's employment.   It is also undisputed that neither Ruffin nor Cunningham nor French knew anything at all about Culpepper's complaints regarding STRADA, and that those complaints played no role whatsoever in their decision to end her employment.  Even Culpepper herself did not identify Ruffin or Cunningham or French as persons to whom she made complaints regarding STRADA.  The decision-makers' complete lack of awareness of the alleged protective activity is fatal to Culpepper's retaliation claim.  *See Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 897 (11th Cir. 2005) (a FCA retaliation claim failed as a matter of law where relator was unable to show the decision-maker was aware of his protected conduct); *Reynolds*, 620 F. App'x 785, 792 (same).[12]

Although at trial Culpepper attempted to change her prior sworn testimony to identify several Board members to whom she made complaints about STRADA, the

---

[12]  Culpepper has presented legally insufficient evidence that the decision-maker – whether it was Adrian Solomon or Chris Ruffin – knew about the protected activity. First, the evidence is unrebutted that neither person was aware that Culpepper had filed this lawsuit (a contention which Culpepper has never made or attempted to rebut in any event). Second, the evidence is unrebutted that Ruffin knew nothing of Culpepper's alleged STRADA complaints. Third, Culpepper has presented legally insufficient evidence that Solomon understood her complaints about STRADA to be efforts to stop purported violations of the False Claims Act (as opposed to complaints about the BJCTA not following the proper procedures for awarding contracts to STRADA, which is obviously divorced from the claims submittal process). Fourth, the evidence is unrebutted that neither Ruffin nor Solomon knew that Culpepper was allegedly "emailing documents to herself" to support her claims in this lawsuit. Fifth, Culpepper has also presented legally insufficient evidence that her employment was terminated "because of" her complaints about STRADA. The evidence stands unrefuted that Solomon, who Culpepper has pointed to as the alleged decision-maker, was not aware of this lawsuit in April 2018, and Culpepper's complaints about STRADA did not factor into Solomon's decision to suspend Culpepper's employment. And of course there is not a single corroborating document to support Culpepper's claim that she was fired "because of" the alleged protected activity.

changed testimony is irrelevant. There is simply no evidence to link her alleged complaints to various Board members to the decision-maker's decision to end her employment.

### 3. *Temporal Proximity Is Lacking.*

Culpepper also cannot rely on temporal proximity to prove causation. In the absence of any other evidence of causation, as is the case here, "a complaint of retaliation fails as a matter of law if there is a substantial delay between the protected activity and the adverse employment action." *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 908 (11th Cir. 2008). Culpepper's alleged protected activity – her reported concerns that BJCTA was improperly awarding contracts to STRADA – began, by her own admission, in November 2015. The last "sole source contract" (Task Order 24) involving federal funds was awarded by BJCTA to STRADA in May 2017.[13] The alleged adverse action, Culpepper's termination, did not occur until late April 2018, almost a year later.[14] This lengthy delay defeats, as a matter of law, any causal connection between Culpepper's protected activity and the adverse

---

[13] To constitute protected activity, the employee must have had an "objectively reasonable belief that there was a potential violation of the FCA." *Katterheinrich*, 2020 WL 5847648, at *5. As to any Task Orders other than 7, 7a., 7b., 12, and 24, Culpepper could not have had an objectively reasonable belief that BJCTA was violating the FCA because it is undisputed that BJCTA did not obtain any federal funds in connection with those Task Orders. *See also Hickman*, 985 F.3d at 1289-90 (affirming summary judgment against relator, stating "no false claims means no distinct possibility of a False Claims Act lawsuit").

[14] In between those dates, Culpepper was not subject to adverse employment actions. Instead, the evidence established that she received work promotions or pay raises on several occasions. This is antithetical to a retaliation claim.

employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (affirming summary judgment due to lack of causal connection where there was three-month delay between protected activity and termination of employment); *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:15-cv-1797-LCB, 2020 WL 5847648, at *6 (N.D. Ala. Oct. 1, 2020) (finding plaintiff's continual complaints about the bidding process insufficient to establish causal connection because there was a six-month gap between the complaints and the termination).

What's more, even if Culpepper could establish temporal proximity, Murdock's suspension on April 3rd, and the ensuing credit card investigation that ensnared Culpepper, was sufficient as a matter of law to break any causal link between Culpepper's protected activity and the adverse employment action. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (noting that "intervening acts" can break a causal link).[15] The evidence established that Murdock's employment was suspended for misuse of a BJCTA credit card on April 3, 2018. Thereafter, the finance department was asked by BJCTA attorneys to investigate who else had improperly used a BJCTA credit card, and the information was turned over to the attorneys. Then, on April 25, 2018, approximately three

---

[15] Courts in the Eleventh Circuit have applied the intervening acts concept to FCA retaliation claims. *See United States ex rel. Blankenship v. Lincare, Inc.*, No. 2:19-cv-00104, 2012 WL 649795, *14 (S.D. Ala. Jan. 29, 2021).

weeks after Murdock's employment was suspended, Culpepper's employment was suspended for the exact same reason. She was then fired a few days later. To the extent that one could infer a causal connection between Culpepper's protected activity and the subsequent adverse employment action, the undisputed facts relating to the credit card investigation undoubtedly break that alleged causal connection.

### 4. *Culpepper Cannot Establish Pretext.*

Here, two former BJCTA employees and the Board Chairman of the BJCTA all concurred that Culpepper's employment was terminated for misuse of a company credit card. Misuse of a company credit card has been recognized as a legitimate, non-retaliatory reason for terminating an employee's employment. *See*, *e.g.*, *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (finding same).[16]

BJCTA has met its burden of producing a legitimate, non-retaliatory reason for the termination of Culpepper's employment. The reason given was testified to by numerous former employees of BJCTA, and matches up to the reason that Murdock's employment was suspended a few weeks earlier. There was no credible evidence to the contrary. Thus, no reasonable juror could find that BJCTA's reason was a mere pretext for FCA retaliation.[17]

---

[16] The sequence of events leading up to the termination decision – the suspension of Murdock's employment and the ensuing credit card investigation – lends even more credence that the foregoing reason was legitimate, and had nothing to do with FCA retaliation.

[17] The only evidence Culpepper has pointed to is her unsupported speculation of the reason she was fired, which does not constitute a legally sufficient basis for her to prevail on her FCA

### 5. *The Issue Of Mental Anguish Damages Cannot Go To The Jury.*

"A plaintiff may be compensated for intangible, psychological injuries…." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338 (11th Cir. 2005).  But "compensatory damages for emotional distress may not be presumed for every constitutional [or statutory] violation, but must be proven by competent, sufficient evidence."  *Id.*  *See also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("Compensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of constitutional or statutory rights, but require specific individualized proof….").

"[S]uch damages are 'customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Akouri*, 408 F.3d at 1345 (quoting *Carey v. Piphus*, 435 U.S. 247 (1978)).  "[A]lthough a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress …, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)).

---

retaliation claim. *See*, *e.g.*, *Davis v. Thompson*, 367 F. Supp. 2d 792, 805 (D. Md. 2005) (an employee's "own speculation, however sincerely he may hold to it," is an insufficient basis to avoid judgment as a matter of law).

Here, Culpepper has not presented **<u>any</u>** evidence from which the jury could determine mental anguish damages – not even her own testimony. Culpepper did not answer **<u>one single question</u>** about how the alleged FCA retaliation has affected her mentally or emotionally. So, there is literally no evidence through which a jury can determine the manner in which the alleged retaliation had an "effect on" Culpepper, and no evidence from which a jury can conclude that Culpepper suffered "demonstrable emotional distress." Instead, the jury would have to presume that Culpepper suffered such distress based solely on the fact that she lost her job as a result of alleged retaliation, and then divine an amount to award Culpepper in the complete absence of any testimony from Culpepper regarding how the alleged retaliation has affected her mentally or emotionally. This the jury cannot do, as a matter of law.

## V.   <u>OTHER GROUNDS</u>

1.     There is no legally sufficient evidence that BJCTA or Murdock engaged in any actions (or made any statements) that could establish that any of the Grant awards were fraudulently procured in the first place.  There is no evidence of fraudulent inducement, or that these Defendants engaged in any promissory (or other fraud) to obtain those grant funds.

2.     There is no legally sufficient evidentiary basis that Starr Culpepper would have been promoted to a position of in-house counsel at the BJCTA.  No such

position exists now, or when Starr Culpepper was employed at the BJCTA, or at any time in between.

3.      There is no legally sufficient evidence that Starr Culpepper would have received a salary of $120,000 per year as an in-house counsel at the BJCTA.  No witness testified that the BJCTA agreed to pay her that amount.  Culpepper and her expert rely on speculation and guesswork on that subject.

4.      There is no legally sufficient evidence supporting any back-pay damages for the year 2021.  Culpepper was legally obligated to provide her actual earnings for 2021, because she can only recover "net pay" under the controlling statutes.  But she failed or refused to provide this information before or during trial.

## VI.   CONCLUSION

For all of the foregoing reasons, this Court should grant Defendants' Rule 50(a) motion on all of the remaining claims asserted in the Second Amended Complaint.

Respectfully Submitted,

*s/ Michael K.K. Choy*
Michael K. K. Choy
Robert H. Rutherford
Ellen T. Mathews
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

mchoy@burr.com
robert.rutherford@burr.com
emathews@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I hand-filed the foregoing Defendants Birmingham Jefferson County Transit Authority and Barbara Murdock's Rule 50(a) Motion at the Close of the Case with the Clerk of the Court, and provided copies of the foregoing to the following:

**Don B. Long, III**
**Margaret Lester Marshall**
Assistant United States Attorneys
United States Attorney's Office - NDAL
1801 4th Avenue North
Birmingham, Alabama 35203
T: (205) 244-2106
T: (205) 244-2121
Email: don.long2@usdoj.gov
Email: margaret.marshall@usdoj.gov
*Counsel for United States of America*

**Sidney Jackson**
**Samuel Fisher**
**WIGGINS, CHILDS, PANTANZIS**
**FISHER & GOLDFARB, P.C.**
301 19th Street North
Birmingham, Alabama 35203
Phone: (205) 314-0500
Fax: (205) 314-0835
*Attorneys for Relators/Plaintiffs*

**Larry A. Golston, Jr.**
**Leon Hampton, Jr.**
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
*Attorneys for Relators/Plaintiffs*

**Anil A. Mujumdar**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35205
T: (205) 590-6986
Email: anil@dagneylaw.com
*Attorney for STRADA and Edmond Watters*

*s/ Michael K. K. Choy*
Of Counsel

46